[Cite as *Woodbury v. Woodbury*, 2018-Ohio-2026.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## GREENE COUNTY

| | | |
|---|---|---|
| STACY WOODBURY | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2017-CA-57 |
| | : | |
| v. | : | Trial Court Case No. 2014-DR-310 |
| | : | |
| JARROD WOODBURY | : | (Domestic Relations Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 25th day of May, 2018.

. . . . . . . . . . .

EDWARD A. FRIZZELL, Atty. Reg. No. 0082601, 129 S. Detroit Street, Xenia, Ohio 45385
　　　Attorney for Plaintiff-Appellee

JOHN C.A. JUERGENS, Atty. Reg. No. 0037120, 1504 N. Limestone Street, Springfield, Ohio 45503
　　　Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

**{¶ 1}** Jarrod Woodbury appeals from a Final Judgment and Decree of Divorce of the Greene County Court of Common Pleas, Domestic Relations Division, which named Stacy Rader (formerly known as Woodbury) the legal and custodial parent of the parties' two minor children and made various provisions for parenting time and child support.

**{¶ 2}** For the following reasons, the judgment of the trial court will be affirmed.

### Background and Procedural History

**{¶ 3}** The parties were married on May 14, 2014, and Rader filed a complaint for divorce on December 13, 2014. The parties have two children; K.W. was born prior to their marriage, and H.W. was born after their separation. K.W. was 2 years old at the time of the hearing, and H.W. was a few months old. Because the parties did not dispute the parentage of the children, the trial court treated both children as children of the marriage. Rader sought to be the legal and custodial parent of the children; Woodbury sought shared parenting.

**{¶ 4}** While the divorce was pending, the magistrate issued a temporary order naming Rader as K.W.'s legal and custodial parent. (H.W. was not yet born.) The parties entered into an agreement regarding parenting time, which allowed Woodbury every other weekend and two midweek visits with K.W. When H.W. was born, Woodbury initially had parenting time with H.W. at Rader's home at the beginning and end of his weekends with K.W.

**{¶ 5}** A magistrate conducted a hearing on the complaint for divorce and parenting issues on November 5, 2015 and January 14, 2016. The evidence presented at the hearing was as follows:

{¶ 6} Rader testified that her marriage with Woodbury broke down because he became "distant," set up a profile on a dating website, refused to end contact with someone with whom he had had an affair, and went out drinking with his friends in the evenings instead of staying home with her. The specific event that caused Rader to leave occurred in December 2014: Woodbury woke Rader up in the middle of the night, yelling at her about why she had locked her phone. The noise woke their daughter, K.W., who began to cry, and Woodbury would not let Rader go to K.W. From her past experiences with Woodbury, Rader knew that he was "very quickly approaching that level of anger where he would get physical." She was crying, shaking, and asking Woodbury to stop holding and yelling at her. He wanted to lay together in their bed, which she agreed to do in order to diffuse the situation. Rader moved to her parents' house, sought a civil protection order, and filed for divorce within the next few days. At the time of their separation, Rader was pregnant with H.W.

{¶ 7} Rader stated that she was the primary caregiver for K.W. during the marriage and that, even when she (Rader) was sick, Woodbury did not care for K.W. According to Rader, Woodbury was easily aggravated by K.W.'s behavior, especially crying or fussiness, which was common considering K.W.'s young age. Rader recounted that, when K.W. cried, Woodbury had on occasion held her very tightly, held a hand over K.W.'s mouth, or cursed and yelled at her until she stopped. Rader acknowledged, however, that Woodbury had gotten better at holding his temper with K.W. as she got a little bit older.

{¶ 8} In terms of physical abuse, Rader stated that she recalled only one incident when Woodbury had hit her during their marriage: she had been holding K.W., who was

a baby, and Woodbury punched Rader in the shoulder and threatened and intimidated her "in her face." She stated that there had also been some physical abuse before their marriage.

{¶ 9} Rader testified that Woodbury took Adderall and blood pressure medicine; he also received counseling. She believed that, for a time, these things had helped with Woodbury's anger issues. But he would sometimes stop taking the medication, and Rader would urge him to resume. She had warned Woodbury that she would leave if he did not do something about his anger issues and stop his affairs.

{¶ 10} Rader's mother also testified about Woodbury's interaction with his children. She stated that, when K.W. was an infant, "every little thing [K.W.] did seemed to upset him," but that his interactions with K.W. recently had been more "under control." Rader's mother had supervised some visits between Woodbury and the new baby, H.W., at her house, and there had been no problems, but she expressed nervousness about how Woodbury would handle unsupervised visits with H.W., based on his short patience with K.W. when she was H.W.'s age.

{¶ 11} Woodbury testified that, at the time of the hearing, he was taking Adderall two times a day; he was also seeing a "licensed clinical counselor" and had been since 2006. Woodbury stated that his anger issues were under control. He recounted that, in 2014, he had weaned himself off of his medication with his doctor's permission, but he was off the medication for less than a year when he decided to resume it. His doctor suggested it would "help with * * * calming down and * ** getting aroused too quickly."

{¶ 12} In addition to his two children with Rader, Woodbury has another son, L.W., who is two years older than K.W. Woodbury had visitation with L.W. on alternating

weekends and three weeknights of each two week period, and he pays child support. Woodbury testified that, when he and Rader were together, Woodbury had sought shared parenting of L.W., and Rader had supported him in this effort, although she did say he was "sometimes * * * a little quick to discipline [the kids] or sit them in timeout." Woodbury admitted to "cheating" on Rader and to hitting her on the arm one time during their marriage when they were arguing about his cheating; he did not remember hitting her any other time. He stated that some of his incidents of frustration in dealing with K.W.'s fussiness stemmed from people trying to take K.W. away from him in those situations, rather than the fussiness itself. He stated that he did not hit the children but had spanked them perhaps a dozen times, combined. Although he denied many of Rader's claims against him, Woodbury believed that they could cooperate with shared parenting. Woodbury stated that Rader was the primary caregiver for K.W. during the marriage, but he stated that he was also involved in her care.

{¶ 13} Woodbury admitted that, on one occasion when he had been having supervised visitation with K.W. at his mother's house, he took K.W. to his apartment alone to do laundry and then fell asleep. He stated that he did not think he had violated the terms of supervised visitation because he had believed his sister was also coming to his apartment (although she did not).

{¶ 14} Woodbury lived in a one-bedroom apartment; he stated that he had beds for all the children in the bedroom, including toddler bunk beds and a crib. He had a roommate who was moving out in the near future.

{¶ 15} Woodbury's mother, Shawn Tucker, acknowledged that Woodbury and Rader had had a "somewhat tumultuous relationship" and that Woodbury had a temper.

But she testified that Rader had recently supported Woodbury's efforts to obtain shared parenting of his son, L.W., and that Rader stated she thought Woodbury was a good father. Tucker identified Rader as the primary caregiver, but stated that Woodbury's parenting was "appropriate" and that both Rader and Woodbury love their children. Tucker described Woodbury as "the disciplinarian" (which she described as timeouts followed by hugs).

{¶ 16} Tucker stated that she had never seen Woodbury hit Rader and that Rader had never complained about Woodbury's parenting. According to Tucker, Rader had stated that she only obtained a civil protection order in December 2014 "because she was afraid that if she'd let [Woodbury] come and talk with her that she would forgive him and go back with him." Tucker believed that the couple could cooperate and engage in shared parenting.

{¶ 17} Testifying in rebuttal, Rader denied that she ever told Tucker that she obtained a civil protection order to avoid being tempted to go back to Woodbury. She also testified that Woodbury had spanked the children more than a dozen times.

{¶ 18} With respect to their wishes about parenting, Rader testified that she would like to be the legal and custodial parent of the children. Although she believed that Woodbury had become better in terms of managing his temper with K.W., she did not want Woodbury to have significant unsupervised time with H.W. because H.W. cannot "speak up" for himself like K.W. can. She also believed that the children were too young for week-by-week shared parenting, because keeping a routine was important at their ages, and the two households would not only have different parents, but also different childcare providers and schedules. This would make having a routine very difficult, and

she thought this was too much for young children to handle. Rader had no objection to attempting to coordinate visitation with Woodbury's visits with L.W., so that all the siblings would have time together. She believed that the parties were able to communicate about issues involving the children. Rader agreed to begin providing some of the transportation for the children's visits, which she had not been doing up until that time. The parties lived 1½ to 1¾ hours apart by car.

{¶ 19} Woodbury sought shared parenting with an alternating week-by week-schedule.

{¶ 20} There was no guardian ad litem in this case.

{¶ 21} The magistrate found that it was in the children's best interest to name Rader the legal and custodial parent and grant parenting time to Woodbury. The magistrate concluded that the parties did not communicate and cooperate well enough to order shared parenting, noting the "substantial conflict and limited violence during the marriage." The magistrate also cited the young ages of the children, the significant distance between the parents' homes, and Woodbury's limited contact with H.W. up to that time. The magistrate acknowledged that Woodbury's medication seemed to be having its desired effect on his stress and impulse control issues, but nonetheless concluded that the children's best interest would be served by awarding custody to Rader.

{¶ 22} With respect to the specifics of parenting time, the magistrate incorporated the standard order of visitation, with some modifications. Because Woodbury had had limited contact with H.W. and only in a supervised setting, the magistrate increased visitation in "a gradual manner": on the alternating weekend visits, H.W. was to begin weekend visitations at the same time as K.W., but he would be picked up by Rader on

Saturday evening, rather than Sunday evening. This arrangement was to continue until May 2017; from then on, both children would have the full weekend visitation. The order also provided for both children to have three full weeks of visitation with Woodbury in the summer of 2017, and the full amount of visitation provided under the standard order for summers beginning in 2018. The magistrate eliminated the mid-week visitation that is provided in the standard order, without explanation. The magistrate also ordered Woodbury to pay total child support of $783.55 per month for both children, effective January 1, 2016.

{¶ 23} Both parties filed objections to the magistrate's decision and order. Woodbury objected to the denial of shared parenting, the designation of Rader as the legal and custodial parent, the fact that his mid-week visitation, which he had "consistently enjoyed," had been eliminated, and that he received less that the standard order of visitation with both children. Rader's objections asserted that the magistrate had failed to adequately account for Woodbury's violent and abusive behavior, his "lack of consistency in his time with the children," his efforts to manipulate Rader through the visitation, and her concerns about expanded visitation.

{¶ 24} The trial court overruled all of the objections. Its Final Judgment and Decree of Divorce, filed on October 18, 2017, allocated parental rights and responsibilities and parenting time and ordered Woodbury to pay child support in a manner that was consistent with the magistrate's decision.

{¶ 25} Woodbury appeals from the trial court's Final Judgment and Decree of Divorce, raising five assignments of error.

*Custody Determination*

{¶ 26} In his first assignment of error, Woodbury argues that the trial court abused its discretion and erred in naming Rader as the custodial parent, rather than adopting shared parenting. He contends that this decision was against the manifest weight of the evidence and was "to the detriment" of the children. He also argues, more generally, that Rader is not compliant with the terms of visitation, hassles him unnecessarily, and does not give him "credit" where it is due.

{¶ 27} "The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). Under the abuse-of-discretion standard in a custody case, "disputes about the facts, the weight accorded the testimony, and the credibility of witnesses are left to the trial court." *Gartin v. Gartin*, 2d Dist. Clark No. 2011-CA-74, 2012-Ohio-2232, ¶ 7, citing *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997). "The question is whether evidence was presented that, if believed, supports the trial court's findings." *Id.*, citing *Ross v. Ross*, 64 Ohio St.2d 203, 204, 414 N.E.2d 426 (1980). An abuse of discretion occurs when the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 28} Pursuant to R.C. 3109.04(F)(1), the trial court must consider all relevant factors in determining the best interest of a child with respect to custody and visitation, including, but not limited to: the wishes of the child's parents; the wishes and concerns of the child, if appropriate; the child's interaction and interrelationship with his or her parents, siblings, and any other person who may significantly affect the child's best interest; the

child's adjustment to home, school, and community; the mental and physical health of all persons involved in the situation; the parent more likely to honor and facilitate parenting time or visitation and companionship rights; whether either parent has failed to make all required child support payments; whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent has denied the other parent's right to parenting time in accordance with an order of the court; and whether either parent has established a residence, or is planning to establish a residence, outside this state. *See also Portis-Phillips v. Phillips*, 2d Dist. Clark No. 2016-CA-34, 2016-Ohio-7803, ¶ 19.

{¶ 29} Additionally, in determining whether shared parenting is the best interest of a child, the court shall consider: the ability of the parents to cooperate and make decisions jointly with respect to the children; the ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent; any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent; the geographic proximity of the parents to each other and the practical considerations of shared parenting; and the recommendation of the guardian ad litem of the child, if the child has a guardian ad litem.   R.C. 3109.04(F)(2).

{¶ 30} The trial court did not abuse its discretion in concluding that shared parenting was not in the best interest of the children and that Rader should be the legal and custodial parent.   All of the witnesses testified that Rader was the primary caregiver for the children, although Woodbury testified that he also cared for K.W.   H.W. was born after the parties were living separately and, at the time of the hearing, Woodbury had never had unsupervised visitation with him.   The parties' residences were a significant

distance apart. Woodbury could not name the children's pediatrician. He also could not provide the full name of the person that he proposed as a childcare provider, if he were to have shared parenting, notwithstanding that this person was already the caregiver for Woodbury's older child; he testified that the caregiver would charge the same rate for three children as for one, and that she would not charge him for the weeks the children were not in his care. All of the witnesses also testified that Woodbury had a temper and that, at least during some periods in the past, he had anger management issues. The record amply supports the trial court's conclusion that it was in the children's best interest for Rader to be the residential and custodial parent.

{¶ 31} Beyond the question of the custody determination, Woodbury argues at length under this assignment of error that Rader had "misinterpreted" the court's orders "to serve *her* interests" (emphasis sic), did not willingly comply with visitation orders, deliberately scheduled and communicated with him about appointments for the children in a manner that made it difficult for him to attend, interfered with his visitation in other ways, hassled him for taking one of the children to an emergency room, and refused to give him "credit for all the wonderful things he does for the children." He also asserts that, "midway through the final divorce proceedings, [Rader] substituted her counsel of record" and retained the attorney used by the mother of Woodbury's other child, L.W., and "[e]ver since, * * * [Woodbury] had experienced problems with both mothers in regards to schedules and conflicts."

{¶ 32} To the extent that these matters preceded the final judgment and decree of divorce, there is no evidence in the record to support Woodbury's claims. To the extent that Woodbury's arguments assert Rader's noncompliance with the terms of the

decree after it was entered, such matters are outside the record of this case and are properly addressed through a motion for contempt; we cannot deal with enforcement issues on appeal from a final judgment and decree of divorce. We observe, however, that Woodbury's argument that there has been extensive conflict between the parties about parenting and visitation issues before and since the time of the divorce may undercut his argument that the parties were or are well-suited to shared parenting.

{¶ 33} The cases upon which Woodbury relies involve reallocation of parental rights following the decree of divorce, based on evidence of the custodial parent's interference with the non-custodial parent's visitation and "poison[ing]" the children's relationship with the non-custodial parent, *Chelman v. Chelman*, 2d Dist. Greene No. 2007 CA 79, 2008-Ohio-4634, ¶ 25, or otherwise adopting a lifestyle that was not in the best interest of the child(ren). *Cure v. Cure*, 2d Dist. Clark No. 2011 CA 73, 2012-Ohio-2966, ¶ 29. Because this record does not contain such evidence, the cases are not analogous.

{¶ 34} The first assignment of error is overruled.

***Interim Order of Visitation***

{¶ 35} In his second assignment of error, Woodbury argues that the magistrate failed to timely rule on his objections, entered a "vague" interim order, and did not properly renew its interim order.

{¶ 36} In February 2015, about six weeks after the complaint for divorce was filed, the magistrate issued a temporary order which designated Rader as the temporary legal and custodial parent, ordered the parties to agree on visitation, and ordered Woodbury to pay child support for K.W. The parties subsequently filed an agreed order, which the

magistrate signed, that Woodbury would have visitation with K.W. every other weekend. A few months later, the parties reached another agreement, approved by the magistrate, which added midweek visits with K.W. and provided for Woodbury to visit with the as-yet unborn baby at Rader's home before and after K.W.'s weekend visits. On September 30, 2016, Woodbury filed a motion to find Rader in contempt with respect to allowing parenting time.

{¶ 37} The magistrate's decision and order addressing all of the issues in the case was filed on October 28, 2016. This decision acknowledged Woodbury's pending motion for contempt but did not specifically address it; however, the final sentence of the decision stated that any other motion not specifically addressed was denied.

{¶ 38} Woodbury filed objections to the magistrate's decision on November 9, 2016. On November 28, 2016, Rader filed a motion for leave to file objections out of time and simultaneously filed her objections. The same day, she also filed a motion for a hearing on parenting time, which sought to suspend Woodbury's parenting time or, in the alternative, to have it be supervised. Woodbury opposed Rader's motion for leave to file objections. In December 2016, he also filed a motion to hold Rader in contempt for interfering with his visitation and adversely affecting his ability to bond with the children. In early January 2017, Rader filed a motion for an immediate hearing on the court's interim orders, and Woodbury filed supplemental objections to the magistrate's decision.

{¶ 39} On January 11, 2017, the trial court ruled on the pending motions. The court overruled (i.e., refused to consider) Rader's objections, because they were untimely and she had failed to show good cause for their untimely filing. The trial court also

overruled Woodbury's request for a finding of contempt, finding that the motion was "premature," that "parenting time was stayed by [Woodbury's] objections," and that the magistrate's decision and order had granted Woodbury additional time with both children. The trial court denied the requests for additional hearings on any of these issues. The trial court did not address the parties' objections or enter a final judgment and decree of divorce at this time.

**{¶ 40}** On January 30, 2017, Woodbury filed a "motion to reconsider and clarify." In its introduction, the motion seemed to be directed to the trial court's entry of January 11, but in substance, it challenged the magistrate's October 28, 2016 decision and order on all of the issues in the case, insofar as he (Woodbury) sought mid-week visitation with both children, "full weekend parenting time" with H.W. beginning immediately, or, in the alternative, that the magistrate specify when, in the future, Woodbury would be entitled to additional parenting time with the children, such as mid-week and full-weekend visitation, and a change in the drop-off and pick-up location. These arguments mirrored some of Woodbury's previous objections. The trial court overruled this motion on February 6, 2017; the trial court referenced its January 11, 2017 interim order and stated that "[p]ursuant to the Civil Rule it will be reviewed 28 days after it was filed and not before that date."

**{¶ 41}** Woodbury argues that the court's interim order of January 11, 2017 was "so vague as to not address" many of his concerns about "his right to exercise parenting time with his children."

**{¶ 42}** "[T]he final divorce decree should replace all interim orders that transpired before it." *Leblanc v. Leblanc*, 2d Dist. Greene No. 95-CA-43, 1996 WL 283939, *3 (May

31, 1996), citing *Colom v. Colom*, 58 Ohio St.2d 245, 247, 389 N.E.2d 856 (1979). *See also In re Emergency Guardianship of Stevenson*, 9th Dist. Medina No. 04CA0036-M, 2005-Ohio-997, ¶ 11; *Beil v. Bridges*, 5th Dist. Licking No. 99CA00135, 2000 WL 977221, *3 (July 13, 2000). As such, issues related to the interim orders are moot once a final judgment is entered, i.e., they have "no practical significance, being instead merely hypothetical or academic." *In re Guardianship of Weller*, 2d Dist. Montgomery No. 24337, 2011-Ohio-5816, ¶ 7. As such, an interim order may not be appealed following a final judgment. Woodbury's notice of appeal implicitly acknowledges this fact, insofar as he appealed from the court's final judgment.

{¶ 43} The second assignment of error is overruled.

### Mid-Week Visitation

{¶ 44} In his third assignment of error, Woodbury argues that the trial court erred in eliminating his mid-week parenting time, when he had been consistently exercising such visits under the temporary orders while the case was pending.

{¶ 45} The magistrate's decision did not expressly address mid-week visitation except to say that "Mother agrees that parenting time with [K.W.] should be pursuant to the Court's Standard Order without midweek time." The "interim order" filed on January 11, 2017, which increased Woodbury's time with H.W., also stated there would be no mid-week parenting time, "due to the distance between the parties' homes." Woodbury objected to the elimination of the mid-week visits. In overruling the objection, the trial court observed that the children "are extremely young," that the parties lived a significant distance apart (more than an hour and 15 minutes each way),[1] that mid-week parenting

---

[1] Woodbury testified that the drive time was 1¾ hours between the parties' houses or 1½

time "places an unnecessary burden on" Rader, and that mid-week parenting time therefore was not in the children's best interest.

**{¶ 46}** It does not appear from the record that Rader requested the termination of mid-week visitation. She testified at the hearing that she wanted to retain the schedule for K.W. that was set forth in the agreed entry, and this entry provided for mid-week visitation. However, Woodbury did not address the issue of mid-week visitation at the hearing. Although his brief suggests that the mid-week visits presented no burden for Rader because Woodbury "drove to Mt. Cory, visited with the children at the McDonald's less than 15 minutes away and then returned the kids to" Rader, these facts are not contained in the record.

**{¶ 47}** The record supports the trial court's findings that the distance between the parties' homes is over an hour's drive and that the children are very young. We cannot conclude that the trial court abused its discretion in concluding that mid-week visitation was not in the children's best interest. It is less clear from the record how the mid-week parenting time "place[d] an unnecessary burden on [Rader]," because the record contains little evidence about how this parenting time was effectuated. Nonetheless, we cannot conclude that the trial court abused its discretion in resolving this issue as it did.

**{¶ 48}** The third assignment of error is overruled.

***Pick-Up and Drop-Off Locations***

**{¶ 49}** Woodbury asserts that the trial court abused its discretion in adopting a

---

hours from his work to Rader's house. In overruling Woodbury's objections, the trial court found that the parties "lived one hour and twenty-three minutes apart." This number appears to be based on the trial court's own calculation, and not on any evidence that was presented.

pick-up and drop-off location that was "clearly disadvantageous, inequitable, and an undue burden" on him. He bases this argument on the fact that Rader moved far away from her residence with Woodbury and "should not be rewarded for her selfish decision," on alleged conflicts between the pick-up and drop-off times of K.W. and H.W. and the pick-up and drop-off times for Woodbury's visits with his other son, L.W., and very generally on Rader's alleged unwillingness to be "flexible" or to give Woodbury "any benefit of the doubt." The chosen location was a Wendy's restaurant in Anna, Ohio, off Interstate 75, located approximately halfway between the parties' homes.

{¶ 50} Woodbury did not object to the proposed location of the parenting exchange at the hearing or in his objections or supplemental objections to the magistrate's decision. Thus, he has waived all but plain error with respect to this issue. *Clayburn v. Clayburn*, 2d Dist. Montgomery No. 27476, 2017-Ohio-7193, ¶ 16, citing *Cox v. Cox*, 2d Dist. Montgomery Nos. 18345, 18350, 2000 WL 1838266, *4 (Dec. 15, 2000); Civ.R. 53(D)(3)(b)(iv). In appeals of civil cases, the doctrine of plain error is disfavored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, and thereby challenges the legitimacy of the underlying judicial process itself. *In re C.B.*, 2d Dist. Montgomery No. 24564, 2011-Ohio-4537, ¶ 9, *citing In re A.J.S. & R.S.,* 2d Dist. Miami No. 2007 CA 2, 2007-Ohio-3433, ¶ 16.

{¶ 51} Moreover, at the hearing, Rader's proposed plan for exchanging the children was discussed, including the exchange location in Anna, Ohio. Woodbury did not express any problem with the plan, including the location for exchanges. The plan,

which was adopted by the trial court, was for the parties to meet in Anna on Fridays to exchange the children at the beginning of weekend visits; then, on Saturdays, Rader would pick H.W. up at Woodbury's house, and on Sunday, Woodbury would return K.W. to Rader's house. The parties' driving obligations were equivalent, and Woodbury admitted at the hearing that this plan would result in less driving on his part than under the previous arrangement, where he was primarily responsible for transportation.

{¶ 52} Woodbury also asserts in his brief that the trial court abused its discretion in "fail[ing] to compare the time schedules for all the minor children" so as to avoid conflicts between the pick-up and drop-off times and locations for Woodbury's children with Rader and his older child, the orders for which were both "out of Greene County." But Woodbury did not present the order related to parenting time in L.W.'s case in this proceeding, and the trial court did not have an obligation to conduct research on his behalf. Woodbury also did not testify about his parenting time schedule with L.W. in sufficient detail for the trial court to know that the order adopted in this case allegedly presented a conflict.

{¶ 53} The trial court did not abuse its discretion, much less commit plain error, in designating the Wendy's location for exchanging the children.

{¶ 54} The fourth assignment of error is overruled.

### Child Support

{¶ 55} In his fifth assignment of error, Woodbury argues that if the parenting time order was "stayed * * * pending the outcome of the objections," he should have been informed of this fact and he should not have been required to pay child support during this period. He asserts that the trial court retroactively increased his child support while

"deny[ing] [him] the privileges of parenting time."

{¶ 56} Woodbury's argument is not supported by the record. Although the trial court's "interim" order of January 11, 2017, does state that "parenting time was stayed by [Woodbury's] objections," there is no indication in the record that the parenting time to which the parties' agreed at the outset of these proceedings ever stopped. Rather, read in conjunction with the procedures set forth in Civ.R. 53(D), we interpret the trial court's interim order to suggest that, to the extent that the magistrate's decision and order differed from the agreed order, the changes did not go into effect until the trial court ruled on the parties' objections.

{¶ 57} When the magistrate's decision and order was filed on October 28, 2016, it provided for total child support for the two children in the amount of $783.55 per month, effective January 1, 2016.[2] This amount was based on the child support computation worksheet. Woodbury did not object to the magistrate's proposed effective date, and thus he has waived his argument that child support should not have been imposed "retroactively." He also did not object to the child support calculation. In its judgment, the trial court ordered child support in the same amount and, like the magistrate, the trial court used an effective date of January 1, 2016.

{¶ 58} Neither the magistrate nor the trial court stated a reason for making the child support modification effective on January 1, 2016. However, there was nothing unreasonable about the date chosen, especially since Woodbury did not object or suggest

---

[2] For simplicity, we refer to the amounts Woodbury was required to pay if he were providing health insurance for the children, as he was at the time of the hearing. The magistrate's and trial court's orders also provided a different amount, which included cash medical support, in the event health insurance were not provided.

the use of an alternate date. Woodbury's argument that he should not have had to pay child support during the pendency of these proceedings because his parenting time was "stayed" finds no support in the law or in the record, because there is no evidence that he was denied parenting time for any extended period. The trial court did not err in choosing the effective date of the child support modification.

{¶ 59} The fifth assignment of error is overruled.

{¶ 60} The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and HALL, J., concur.

Copies mailed to:

Edward A. Frizzell
John C.A. Juergens
Hon. Steven L.W. Hurley