[Cite as *S.P. v. M.G.*, 2021-Ohio-1744.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY**

| | | |
|---|---|---|
| [S.P.] | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2020-CA-42 |
| | : | |
| v. | : | Trial Court Case No. 2017-DM-98 |
| | : | |
| [M.G.] | : | (Domestic Relations Appeal) |
| | : | |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 21st day of May, 2021.

. . . . . . . . . . .

BRIAN A. SOMMERS, Atty. Reg. No. 0072821, 10532 Success Lane, Dayton, Ohio 45458
 Attorney for Plaintiff-Appellee

ADAM ARMSTRONG, Atty. Reg. No. 0079178 and MATTHEW D. DICICCO, Atty. Reg. No. 0072889, 40 North Main Street, Suite 2010, Dayton, Ohio 45423
 Attorneys for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-Appellant M.G. ("Father") appeals from several judgments of the trial court. He appeals from a judgment terminating the parties' shared parenting plan and reallocating their parental rights. Father also appeals from two judgments addressing the parties' various contempt motions, arguing that the trial court abused its discretion in refusing to hold Plaintiff-Appellee S.G. ("Mother") in contempt for interfering with his parenting time and ordering Father to pay unreimbursed medical expenses.[1] In an amended notice of appeal, Father also appeals from the trial court's decision to replace the guardian ad litem ("GAL") originally assigned to the case. According to Father, the trial court erred in terminating the parenting plan, in restricting his parenting time, in failing to hold Mother in contempt, in removing the guardian ad litem, and in calculating expense reimbursements. For the reasons discussed below, we find Father's assignments of error to be without merit, other than his complaint about the expense reimbursements, which is sustained. Accordingly, the trial court's judgment terminating shared parenting will be affirmed. The second judgment related to the contempt motions will be reversed insofar as it ordered Father to reimburse medical expenses, and the matter will be remanded for the trial court to correct the judgment entry; in all other respects, that judgment is affirmed. We decline to address the trial court's first judgment related to the contempt motions, because Father does not raise any argument challenging that judgment. We also decline to separately address the trial court's ruling on the removal of the GAL, because it was not a final order and merged into the order terminating shared

---

[1] Because this case involves sexual abuse allegations, we will use initials for the child's name and will refer to the parents as "Mother" and "Father" in order to protect the child's privacy.

parenting, which we affirm.

## I. Facts and Course of Proceedings

{¶ 2} On June 30, 2017, Mother and Father filed a petition in the trial court to dissolve their marriage. They had one child, a daughter, E.G., who had been born in July 2014 and was nearly three years old at the time. Neither parent was represented by counsel during the dissolution; instead, Mother prepared the paperwork. Tr. 4 at p. 57; Tr. 2 at p. 196.[2]

{¶ 3} The parties filed a shared parenting plan under which each parent was designated E.G.'s legal custodian and residential parent, with Mother being the residential parent for school purposes. The parents were also required to consult with each other concerning E.G.'s medical care needs, but in situations where they could not agree, Mother's decision would control. Shared Parenting Plan, p. 2. At the time, Mother was a physician's assistant in orthopedic surgery. Tr. 2, p. 14. Father did not recall specifically discussing this subject with Mother, but agreed after learning about it, because Mother had a medical background and he had no reason to distrust her at that point. Tr. 4, p. 78.

{¶ 4} Under the shared parenting plan, parenting time with E.G. was to be in accordance with the court's Standard Order of Parenting, and Father was designated as the non-residential parent for purposes of the order. Shared Parenting Plan at p. 2.

---

[2] There were five transcripts involving the final custody and contempt hearings in this case, which were held on January 23, May 11, May 12, May 28, and September 28, 2020. To simplify, we will refer to these transcripts, respectively, as Tr. 1, Tr. 2, Tr. 3, Tr. 4, and Tr. 5.

Under the Standard Order, Father would be entitled to parenting time for three hours on Wednesdays and on alternating weekends from Friday at 6:00 p.m. until Sunday at 6:00 p.m. The parties further agreed to deviate from the child support calculation to zero support, despite the fact that Mother made $170,000 per year and Father made $95,000.

{¶ 5} On August 21, 2017, the court filed a judgment entry dissolving the parties' marriage and approving the Shared Parenting Plan. Judgment Entry of Dissolution of Marriage with Children. However, although the parties had agreed to the Standard Order, they did not follow it. Instead, they split time with E.G. on a 50-50 basis, with Father having parenting time from Sunday at 1:00 p.m. to Wednesday at 1:00 p.m.; Mother would then have E.G. from Wednesday at 1:00 p.m. until Saturday at 1:00 p.m. They then would have parenting time on alternating weekends from 1:00 p.m. on Saturday until 1:00 p.m. on Sunday. Tr. 4 at p. 60. This schedule lasted from August 1, 2017, until December 2018. *Id.* at p. 61.

{¶ 6} At the end of July 2018, Father noticed redness in E.G.'s vaginal area and sent Mother a photo, asking if he should do anything other than make sure E.G. was dry. Mother told him to put hydrocortisone on the outer portion of the vagina, and to make sure the area was dry after a bath. Tr. 2 at p. 21, 22, and 25-26; Tr. 4 at p. 240.[3]

{¶ 7} On August 24, 2018, E.G. had a four-year well checkup with her pediatrician. Both parents were present. Mother believed she mentioned that E.G. had a little irritation in the vaginal area, but nothing was documented. At the time, Mother was not concerned. Tr. 2 at p. 34-35. The pediatrician said to apply a thin layer of Vaseline on

---

[3] After this point, most instances of redness were documented first by Mother, as the reports primarily were that Mother observed redness when E.G. was returned to her following Father's parenting time.

the area, and Mother instructed Father on how to apply it.   Tr. 4 at p.72.

{¶ 8} On August 29, 2018, E.G. returned from Father's parenting time with vaginal redness and sores, and Mother texted Father about this.   Mother stated that E.G.'s vagina looked terrible, the worst it had ever been, and had open sores.   Tr. 2 at p. 32-33; Tr. 4 at p. 87-88.    Mother testified that usually E.G.'s vagina had a grimy residue on it that she could feel and wipe clean, and that could have been due to the Vaseline they were using.   Tr. 2 at p. 122.   Mother's interpretation was that Father was not cleaning E.G. hard enough.   *Id.* at p. 124.

{¶ 9} During a text discussion on August 29, 2018, Mother told Father that E.G. had said Father did not wash the area, and Father responded that E.G. did not wipe at school.   Tr. 2 at p. 33-34.   Mother discussed bathing protocol, and Father stated that maybe he was not washing E.G.'s vagina hard enough.   *Id.* at p. 34.   Father also said that E.G. had told him Mother's nails hurt when Mother washed her.   *Id.*   *See also* Tr. 4 at p. 90-91.[4]   Mother admitted that Father had told her that, but said her nails were short due to being in surgery; she also said E.G. never told her that her nails hurt.   Tr. 2 at p. 34-35 and 193.

{¶ 10} On September 5, 2018, E.G. was returned to Mother again with redness and sores.   *Id.* at p. 35.   Mother took a picture of the child's vagina and sent it to Father. During Mother's parenting time on September 5, 6, 7, and 8, the redness persisted but was improving.   *Id.* at p. 36-38 and 41-42.   At that time, Mother was still trying to figure out the cause of the irritation; Father thought perhaps his bathtub slip pad was the cause.

---

[4] Mother's testimony is contained in Tr. 2 and Tr. 3, while Father's testimony is in Tr. 4. Concerning E.G.'s comment about Mother's nails, both parents agreed that Father told Mother about this during the August 29, 2018 text messages.

*Id.* at p. 37-38.    Because there did not appear to be an infection, the parties were still using Vaseline.   *Id.* at p. 42.

{¶ 11} Mother wanted E.G. to stay with her until the redness cleared, but Father wanted to exercise his parenting time.   As a result, E.G. was returned to Father on September 8, 2018, and Father and the child spent the night at his mother's house.   *Id.* at p. 40.   When E.G. was returned to Mother on September 10, 2018, the redness was worse.   *Id.* at p. 39.

{¶ 12} Because the redness appeared to be coming and going, Mother consulted a friend, Ami, who was a nurse practitioner in dermatology.   *Id.* at p. 43.   Ami worked for a Dr. Rupert in Columbus, Ohio.   *Id.*   Ami prescribed a steroid cream, Fluticasone, and the parties began applying it daily in the morning and evening to E.G.'s vaginal area, beginning around September 11, 2018.   Tr. 2 at p. 43-45 and 81.    The cream was used from this time until October 9, 2018, when the redness had cleared up.   *Id.* at p. 53.   By September 17, 2018, the redness was markedly better.   *Id.* at p. 220.

{¶ 13} After mid-October, and based on instructions, the parents applied the cream on weekends and applied Vaseline during the week.   *Id.* at p. 53 and 57; Tr. 4 at p. 82. Mother instructed Father on how to apply the cream, and the application process both parents used was the same: they put a thin layer over the inner labia region and used their fingers to smooth the cream over the genital area.   Tr. 2 at 183 and 185; Tr. 3 at p. 25; Tr. 4 at p. 82-84 and 92.   When the use of the cream was tapered off, redness would return.   Tr. 4 at p. 93.

{¶ 14} After Father's parenting time on October 10 and during his parenting time on October 16 (when the child was staying at her paternal grandmother's house), E.G.'s

vagina was red.   Tr. 2 at p. 54-56.   Mother did not take E.G. to the emergency room or report it to the police or Children Services because she had no idea what was causing the problem.   *Id.* at p. 55.   The duration of the redness could vary from a few days to a week or sometimes longer, depending on how severe the irritation was.   *Id.*   Mother did not note any further irritation the rest of October 2018.   *Id.* at p. 59.

{¶ 15} By late November 2018, about 30 days had elapsed since the last flare-up. *Id.* at p. 61.   On December 5, 2018, after Father had E.G. the two prior nights, Mother noticed that E.G.'s vagina was red, and she told Father.   *Id.* at p. 62-63.   After a night's stay with Father on December 7, E.G. returned again with redness on December 8.   *Id.* at p. 64.   At that point, Mother began to wonder if something at Father's house was causing the redness.   She therefore suggested that E.G. stay with her.   *Id.* at p. 65. After E.G. continued to have redness on December 10 and 11, 2018, while staying with Father, Mother said that E.G. would stay with her until it cleared up and E.G. stayed well. Mother stated that this was not up for debate.   *Id.* at p. 66-69.

{¶ 16} After December 12, 2018, Father had no more overnight parenting time until December 27, 2018.   By agreement, Father exercised his parenting time at Mother's house.   *Id.* at p. 71-72; Tr. 4 at p. 61.     During that time, on Sundays, Mondays, and Tuesdays, and on alternating Saturdays, Father would either pick E.G. up and take her to his parents' house, do something in public away from his house, or do his parenting time at Mother's house   Tr. 4 at p. 62.

{¶ 17} From December 2018 through mid-March 2019, Father exercised his parenting time primarily at Mother's house, where he would play with E.G., eat dinner, and put E.G. to bed together with Mother.   This was a bit awkward on all sides.   Tr. 4 at

p. 68-69; Tr. 2 at p. 73. Father stated that he was willing to do this because he was attempting to do what he could to figure out what was causing the redness, which Mother said primarily occurred at Father's house. Father also did water and radon tests on his house in December 2018 and April 2019, respectively, but the tests were negative. Tr. 4 at p. 69, 98, and 99.

{¶ 18} On December 27, 2018, E.G. was ill, and Father took care of her that day. E.G. returned with an irritation in her vagina. Tr. 2 at p. 74-75. As a result, Mother asked that Father change E.G.'s soap and hand lotion to what Mother was using; Father stated that he used the same products as Mother did. *Id.* at p. 75. According to Mother, after Father took E.G. to his parents' house on December 29 from 9:30 a.m. to 7:45 p.m. to celebrate Christmas, E.G. returned with redness in her vagina. *Id.* at p. 75-76.

{¶ 19} Between then and January 17, 2019, E.G. stayed at Mother's house, with Father exercising parenting time as he had during December 2018, and no redness occurred. Father had parenting time with E.G. overnight for four days from January 17 through January 20, 2019, while Mother was on a business trip. Tr. 2 at p. 80-81. During the trip, Father texted Mother about irritation in E.G.'s vagina. *Id.* at p. 81. Mother suggested, and Father agreed, that they would continue his parenting time at her house. *Id.* at p. 82. They discussed having E.G. see Dr. Rupert, who was a dermatologist. *Id.*

{¶ 20} For many weeks, no further redness occurred while E.G. was exclusively at Mother's house. Again, according to Mother, E.G. came back with redness after Father had taken her to a birthday party in February for a few hours. *Id.* Also, in late February 2019, Father asked Mother to sign a form to modify the shared parenting agreement to

reflect the schedule they had been following. However, Mother refused. Tr. 4 at p. 101-103. Mother denied that this impacted her decision to make an appointment with Dr. Rupert a few weeks later. Tr. 2 at p. 234.

{¶ 21} Both parents then took E.G. to Dr. Rupert's office on March 11, 2019. *Id.* at p. 83. Dr. Rupert conducted a physical exam of E.G., which was normal. Tr. 1 at p. 77. During doctor visits, Mother was the one giving the history and doing most of the talking, as she was in the medical field. Tr. 1 at p. 100 and 116. Mother told Dr. Rupert that the redness occurred primarily at Father's house. Tr. 4 at p. 260. Mother admitted this. However, at trial, Mother insisted that she told Dr. Rupert that E.G. only had symptoms with Father and that the doctor had documented her comment differently. Tr. 2 at p. 238.

{¶ 22} Dr. Rupert's working diagnosis at the time was lichen sclerosus. In a majority of cases, this is "a chronic relapsing condition," which as it "progresses, * * * can cause scarring and permanent thinning and white patches of the skin." Tr. 1 at p. 87 and Tr. 2 at p. 84. Dr. Rupert recommended that E.G. undergo patch testing in the event that there might be an allergy component, and she also made a referral to social services to rule out abusive factors. Following the appointment, Dr. Rupert made a mandated reporting referral to Children's Services. Tr. 1 at p. 150; Tr. 4 at p. 110; Tr. 2 at p. 84. However, on March 13, 2019, Children Services declined to do an assessment/investigation. Mother's May 2, 2019 Motion for Emergency Orders, Termination of Shared Parenting, and for Custody and for Appointment of Guardian ad Litem, verified Memorandum, p. 3-4 and Plaintiff's Ex. 1, p. 2 attached to the Memorandum ("Mother's Motion to Terminate Shared Parenting").

{¶ 23} Shortly after the March 11 appointment with Dr. Rupert, Mother said she did not want Father to continue exercising parenting at her house because it was confusing to E.G. Tr. 2 at p. 239; Tr. 4 at p. 112. As a result, Father began exercising his parenting time away from Mother's house and primarily in public or at his parents' house. He tried to stay away from his house because he was concerned about environmental factors. Tr. 4 at p. 113.

{¶ 24} On March 18, 2019, Dr. Carpenter, a general dermatologist, saw E.G. for an initial evaluation and the start of allergy testing, which is called patch testing. Tr. 1 at p. 69-71. Both parents were present, and the history given was that "in the summer of 2018, [E.G.] started to develop episodes of redness, sometimes associated with fissures in the skin, bleeding, pain. They seemed to be intermittent" and seemed "to flare when she's at father's house." *Id.* at p. 72. Mother did say during this appointment that the episodes seemed to happen only when E.G. was at Father's house. *Id.* at p. 75.

{¶ 25} Dr. Carpenter did not have a working diagnosis on March 18 but thought allergy testing could shed light on why E.G. flared. *Id.* at p. 73. Both parents were aware that E.G. had very sensitive skin. For example, when E.G. got bug bites, the bite would get bigger than a quarter and stick up on the skin a few centimeters unless hydrocortisone was applied immediately. Tr. 4 at p. 73; Tr. 3 at p. 86. E.G. also could not wear necklaces or earrings that were not pure silver or gold. *Id.*

{¶ 26} On March 18, the parents declined a physical exam because Dr. Rupert had done an exam a week earlier, and no flare-ups had occurred since. Tr. 1 at p. 76-77. Dr. Carpenter applied 80 test substances to E.G.'s arms and back, which were allowed to stay in place for 48 hours. The doctor then saw E.G. again on March 20,

2019, to remove the patches and check the results. *Id.* at p. 78-79. No reactions showed after 48 hours, which is typical for patch testing, so E.G. returned again on March 22 and on March 25, 2019. *Id.* at p. 81-84. Both parents were present for all these appointments. *Id.*

**{¶ 27}** The testing showed allergic reactions to fragrances, cobalt metal, and possibly Cinnamic Alderhyde. Tr. 1 at p. 71 and 83 and Plaintiff's Ex. 9, p. 235. Fragrances can be part of soap, detergents, and other products people use on their skin, including toilet paper and wipes. *Id.* at p. 83. Cobalt is a natural earth metal that can be found in jewelry as well as foods. *Id.* at p. 83-84. Based on her testing and examination (which was done on March 25, 2019), Dr. Carpenter's differential diagnoses or list of possible diagnoses, in order of most likely to least likely, were "irritant contact dermatitis, allergic contact dermatitis, * * * psoriasis, and * * * lichen sclerosus." *Id.* at p. 85-86 and Plaintiff's Ex. 9, p. 235-236.

**{¶ 28}** Lichen sclerosus was least likely because the doctor did not see any scarring, thinning, or white patches. *Id.* at p. 88. Psoriasis, an autoimmune condition, can cause redness, but also tends to leave some longer-lasting but not permanent discoloration, which the doctor did not find on the March 25, 2019 visit. *Id.* at p. 91-92. Irritant contact dermatitis is common. A classic example is redness and chapping caused by a person washing her hands too much. Chemical or mechanical factors can also play a part, but patch testing does not test for irritant contact dermatitis; it only tests for allergic contact dermatitis. *Id.* at p. 92. Skin diseases can exist independently of sexual abuse, and all the listed potential diagnoses could be also induced by friction, trauma, or abuse. *Id.* at p. 93.

{¶ 29} During the March 25, 2019 appointment, Dr. Carpenter gave the parents a safe product list and wanted them to use the products at both houses. Before instituting these recommendations, Mother and E.G. went to Father's house for a two-and-a half hour visit on March 26, 2019. Tr. 2 at p. 89-90. As noted, Father also had a radon test performed on April 2, 2019. Tr. 4 at p. 69 and 99.

{¶ 30} Based on the March 26, 2019 visit, Mother and Father talked about Father's implementing the suggested changes, and about the fact that, after he did, E.G. could go over to Father's house to stay. The parenting time in question occurred on April 6, 2019, when E.G. went over to Father's house to stay. Tr. 2 at p. 91. On April 6, 2019, Mother did an exam on E.G. before she went over to Father's house because she wanted a baseline; she also did an exam when E.G. came back on April 7, 2019. *Id.* at p. 92. To do an exam, Mother would visually inspect E.G.'s vagina by spreading her labia with her fingers. *Id.* at p. 93-94. According to Mother, when E.G. returned from Father's parenting time on April 7, 2019, she had redness in her vagina. *Id.* at p. 92.

{¶ 31} Mother notified Father that day that E.G. was red. *Id.* Mother also sent him a photo of E.G. lying naked on the bed. Mother said she had stripped E.G., had checked her, and had changed her to get her ready to go to Temple. Tr. 4 at p. 117. Father told Mother that E.G. had been fine the night before and was fine when she got dressed that morning. *Id.* at p. 125. In addition, Father asked Mother if they could get an appointment with the dermatologist the next day. Because it was Sunday, Mother said she would try the next morning. However, Mother then told Father the next day that she had called and was unable to get in to see the doctor. *Id.* at p. 126. When Father asked when the next time slot was, Mother did not respond. *Id.*

{¶ 32} Mother also claimed that E.G. had redness on April 15, 2019, after Father picked E.G. up at daycare and delivered her two hours and fifteen minutes later to Mother's house. Tr. 2 at p. 96-97. Mother did not know if E.G. had redness while at daycare; she only knew she had it when she came back. *Id.* at p. 97.[5] Mother then made an appointment with Dr. Carpenter for April 19, 2019. Tr. 2 at p. 242.

{¶ 33} Under the Shared Parenting Plan, both parents had a right to participate in major decisions concerning the child's health, the right to authorize medical treatment and to obtain second opinions, and the right to be present with the child at all medical examinations and treatment. Shared Parenting Plan at p. 1-2. The Plan further required the parents to consult with each other about the child's medical care needs, and each parent must "immediately notify the other parent about all major non-emergency medical decisions before authorizing a course of treatment." *Id.* at p. 2.

{¶ 34} Mother testified that she sent Father a text message from the surgical suite at work about the appointment on April 19, 2019, but the message apparently failed to send. *Id.* at p. 99. This message was sent about two hours before the scheduled appointment. *Id.* at p. 242-243. Mother claimed she did not realize that the message had not gone through, due to other text messages she later received from Father that intervened and displayed on her phone's screen. *Id.* at p. 244.

{¶ 35} According to Father, this had never happened before. He stated that the

---

[5] At the custody hearing, Father presented evidence that he obtained later from his cell-phone, which tracked his movements on April 15, 2019. This evidence indicated that during this parenting time, Father was in public places with E.G. other than when he was in transit from E.G.'s daycare to a playground, from the playground to a pizza parlor, and from the pizza parlor to Mother's house. Tr. 4 at p. 119-120. The same was true of Father's parenting time on April 22, 2019, and April 29, 2019. *Id.* at p. 120-122.

parties had always communicated directly with each other about E.G.'s medical appointments so they could both be present.   Tr. 2 at p. 126.   Father did not attend the April 19, 2019 appointment with Dr. Carpenter.

{¶ 36} The history that Mother gave during the appointment was that she had been with E.G. at Father's house for a supervised visit and no flare-up had occurred; Mother then took E.G. for a second visit after the recommended changes were made, and a flare-up occurred.   Tr. 1 at p. 94.   Dr. Carpenter was the first doctor who had seen E.G. during a flare-up; she saw "some ill-defined redness that was on both [E.G.'s] labia and extending to the skin from her labia to her anal area."   *Id.* at p. 95.   "Ill-defined means that where the redness stops and starts can be a little hard to define.   It's not sharply demarcated."   *Id.* at p. 163-164.   Dr. Carpenter "felt it was still non-specific and could fit with multiple diagnoses, the same ones she had listed before."   *Id.* at p. 95.

{¶ 37} Nonetheless, Dr. Carpenter recommended no more unsupervised visits with Father and to consider a biopsy if E.G. flared despite that.   *Id.* at p. 98 and Plaintiff's Ex. 9 at p. 238.   The doctor did not make a referral to Children's Services because one had already been made (the Rupert referral).   Tr. at p. 151.

{¶ 38} Mother did not tell Father about Dr. Carpenter's appointment for about a week.   She was concerned that if Father found out, he would try to enforce standard parenting time and would have E.G. from Friday to Sunday.   Tr. 2 at p. 244-245.   Mother did let Father have parenting time on April 20, 2019, but claimed that a video her boyfriend took showed that E.G. was upset about going with Father.   *Id.* at p. 247-248 and 253-257, and Defendant's Supplemental Ex. YYY.   According to Mother, the video was taken to show that E.G. had a drastic behavior change at that time in terms of not wanting to go

with Father. *Id.* at p. 252 and 255.[6]

**{¶ 39}** On March 31 and April 1, 2019, Father video-recorded his time with E.G. because Mother was becoming more aggressive and hostile toward him and acting as if he had done something wrong. Tr. 4 at p. 151. After his visitation was reinstated on August 25, 2019, he continued video-recording until January 2020, when he scaled back somewhat. He then switched to audio in February 2020. *Id.* at p. 152-153.

**{¶ 40}** Father told Mother about the video-taping at the end of March 2019. *Id.* at p. 152; Tr. 2 at p. 239. Mother admitted knowing that Father had said that he taped E.G.'s visit at the end of March or early April. However, while Father said he told Mother that he was taping all visits, Mother denied knowing this until June 2019. Tr. 2 at p. 151; Tr. 4 at p. 239.

**{¶ 41}** On April 26, 2019, Mother notified Father that Dr. Carpenter wanted him supervised when he was with E.G. Tr. 4 at p. 122-123. Mother then filed a motion on May 2, 2019, requesting an emergency order for supervised parenting time for Father. Mother also asked to terminate the shared parenting agreement and to be appointed sole custodian of E.G. *See* Mother's May 2, 2019 Motion to Terminate Shared Parenting. Father was served with the motion on May 3, 2019. Tr. 4 at p. 134. The day before, Father and his mother had taken E.G. to an appointment with the urology department at Dayton Children's Hospital ("DCH"), because he wanted to take E.G. to an expert and not a general dermatologist who treats all ages. He also wanted to get a second opinion.

---

[6] The trial court was not impressed with this video, and it concluded that the child was initially upset about going outside before she knew Father was there and did not want to go anywhere with anyone. Tr. 2 at p. 257. Mother also showed the Children's Services caseworker this video but did not show her a video Father sent Mother about ten minutes later, showing E.G. completely fine in the car and laughing with Father. Tr. 1 at p. 324.

*Id.* at p. 133-134 and Tr. 1 at p. 176. Father sent Mother a text message about the appointment on the way there. *Id.* at p. 144. Mother was not at this appointment. Tr. 4 at p. 108. According to Father, the urologist said that E.G.'s vaginal irritation was due to poor hygiene. Tr. 1 at p. 176 and 184; Tr. 4 at 241. Mother denied any hygiene problems at her house or being told that E.G. had hygiene problems at school. Tr. 1 at p. 175; Tr. 2 at p. 29 and 67.[7]

{¶ 42} In the memorandum supporting the motion, which Mother verified, Mother alleged that E.G. had "[s]ince June 2018, a rash recurring between twelve (12) and twenty-four (24) times with bleeding, ulcerations, and fissures on the minor child's genitalia that occurs after unsupervised parenting time with Father." Mother's May 2, 2019 Motion to Terminate Shared Parenting at p. 3. Mother did not mention that there had been no bleeding, ulceration or fissures in the nine months before she filed the motion. Tr. 2 at p. 284-285 and 286. Before the motion was filed, E.G. had not made any disclosures about inappropriate touching by Father, although she had told Mother's father about her "pee pee" hurting at her Dad's. Tr. 3 at p. 92.

{¶ 43} On May 2, 2019, the court filed an ex parte order suspending Father's parenting time. The court then set a hearing for May 22, 2019.

{¶ 44} On May 14, 2019, Mother took E.G. to an appointment with Frances

---

[7] Dr. Liker, an expert in pediatric medicine and child sexual abuse, testified that irritant contact dermatitis has many causes such as harsh soaps, bubble baths, and hygiene issues, especially in children E.G.'s age. She stated that sometimes children do not wipe properly, retain urine, or itch or scratch as young children do at that age. Tr. 3 at p. 39-40. Father also presented testimony from the director of the center where E.G. attended preschool. The director stated that there was a note in the file in the spring of 2019 concerning an incident where E.G. was itchy after going to the restroom. When E.G. was asked if she had wiped, she said no. E.G. was then sent back to do so. Tr. 3 at p. 75-76.

Duncan, a therapist who specializes in sexual abuse. Tr. 1 at p. 169 and 170-171. Father was not present. Duncan met with Mother and then talked to E.G. According to Duncan, "Mother stated client has had a chronic severe problem with vaginal and anal redness, pain, very bad ulcerations, and irritation," that Mother had "taken E.G. to a dermatologist over a period of time," that "[t]hese episodes of vaginal irritation seem to occur after visits with her Father," that "client's dermatologist suggested client have a one-month break from visits with Father to see what happens," that "[t]he dermatologist reported her concerns to Children Services," and that "Mother stated client disclosed to her that Father rubs her down there at night – meaning down there, meaning vagina – and that his nails hurt her." *Id.* at p. 175-176 and Plaintiff's Ex. 10. Mother also told Duncan that Father was addicted to pornography. *Id.*[8]

**{¶ 45}** Mother testified that she did not mention E.G.'s disclosure to Mother in the May 2, 2019 emergency motion because it happened afterwards, sometime between May 2 and May 14. Tr. 3 at p. 99.

**{¶ 46}** After talking with Mother, Duncan met with E.G. for about 15 to 20 minutes. During the interview, E.G. stated, "I have a problem with my pee pee. It hurts when I'm at my Dad's." Tr. 1 at p. 177. When Duncan asked what made her "pee pee" hurt, E.G. said that her Daddy rubs it. *Id.* Duncan then asked E.G. where she was when this happened, and E.G. stated she was at her Dad's in her bed. *Id.* As a result of this disclosure, Duncan made a referral to Greene County Children's Protective Services. *Id.*

**{¶ 47}** Children's Services received the referral on May 21, 2019. Tr. 1 at p. 27.

---

[8] Neither E.G.'s alleged disclosure nor Father's alleged addiction had ever been mentioned before. The alleged addiction was also not discussed during the custody hearings, other than the therapist's statement that Mother had reported this.

After a May 22, 2019 hearing during which Dr. Carpenter was the only witness, a magistrate ordered that the shared parenting plan be modified on an interim basis until further investigation could be concluded. The magistrate appointed David Mesaros as the GAL and ordered that Father be allowed supervised visitation at the County Visitation Center for 90 minutes a week. Magistrate's Order, p. 1-2. Father was also allowed to attend E.G.'s school and extra-curricular activities. *Id.* at p. 2. A further hearing was set for July 16, 2019.

{¶ 48} On May 24, 2019, Allivia Clement conducted a forensic interview with E.G. Tr. 1 at p. 27. Clement was a Family Services Coordinator who was employed at DCH, Michael's House. *Id.* at p. 24-25. A Greene County Children's Services Intake Worker, Eve Wojtowicz, observed the interview. *Id.* at p. 283. During the interview, E.G. made disclosures to Clement. E.G. stated "that on one occasion that she was in her bed in her bedroom at her father's house. She was in her pajamas. Her father was in her room, in her words, standing on his knees on the floor. That he touched her – he had rubbed her vagina underneath of her pajamas, and then she went to bed." *Id.* at p. 31-32. Based on the May 24 interview, Clement made an appointment with the Care Clinic at DCH, where E.G. was seen by Dr. Liker. *Id.* at p. 37.

{¶ 49} On May 29, 2019, Dr. Liker performed an evaluation of E.G. Dr. Liker is the Chief of the Division of Child Advocacy for DCH and is an expert in pediatric medicine and child sexual abuse. Tr. 3 at p. 7 and 13. Both parents talked to Dr. Liker on the day of the visit. *Id.* at p. 11. Dr. Liker reviewed the medical records and spoke to Clement about the forensic interview. *Id.* at p. 11-14, and 32. A written summary of the interview was also provided to her. *Id.* at p. 32. In addition, Dr. Liker tested E.G. for all

diseases that could be obtained from urine, and they were negative. *Id.* at p. 31. There was no medical evidence of abuse. *Id.* A normal exam neither negates nor refutes a history of sexual abuse. *Id.* at p. 46.

{¶ 50} At trial, Dr. Liker stated that, assuming that E.G. turned four years old in July 2018, "and that was shortly before the genital irritation symptoms started," that it is "very common" "for children of that age to have genital irritation and redness that is not caused by sexual abuse." *Id.* at p. 17. During trial, Dr. Liker reviewed Protective Exhibits 33, 36, 34, 39, 42, and 41, which were photos of E.G.'s vaginal area taken, respectively, on April 1, April 6 (Exs. 36 and 34), April 20, April 23, and April 27, 2019. Tr. 3 at p. 22; Tr. 2 at p. 275, 277-278, 283, and 285. Mother took all these photos except one. *Id.*

{¶ 51} According to Mother, Ex. 33, Ex. 36, Ex. 39, and Ex. 42 (which were taken during or after Father's parenting time on April 1, April 20, and April 23, 2019), showed redness. Tr. 2 at p. 275, 281, 283, and 284. Mother further indicated that no redness appeared during her parenting time before Father got E.G. on April 27, 2019, or at any other times Mother had E.G. before Father exercised parenting time, other than April 6, 2019. Tr. 1 at p. 126-127; Tr. 2 at p. 21, 25-26, 32, 35, 37, 40, 43, 49, 54, 56, 60, 62, 64, 69, 75-76, 80, 91, 97-98, 100, 137, 241, 279. 281, and 285.[9]

{¶ 52} When Dr. Liker testified about reviewing the April 2019 photos (Protective Exhibits 33, 36, 34, 39, 42, and 41), the following exchange occurred:

---

[9] The photo on April 6, 2019, was taken at 8:30 p.m. during Father's parenting time and Mother did not see any redness. However, Mother testified that E.G. was red the next day, on April 7, when she was returned from overnight parenting time with Father. Tr. 2 at p. 241, 275, 283.

A. I think that what can be visualized in the photos is fairly normal. There is an area of, pink or red pigment in the area of the labia minora.

This pigment can be, can be normal and can be persistent or can be a sign or some sort of irritation or redness that would – that may go away as well. It's hard to discern from the photos. There is a little bit of redness there.

Q. The redness that you see, would you describe it as severe or mild?

A. Mild.

Q. Is there anything in those photographs that you see there concern you or cause you to have a concern about abuse?

A. No.

Q. Are any of those photographs in your opinion consistent with trauma associated with rubbing or abuse?

A. No. Not definitively.

Q. Would any of those photographs cause you concern enough to make a report to Children Services or law enforcement?

A. No.

Tr. 3 at p. 22-23.

{¶ 53} The following further exchange also occurred concerning opinions Dr. Liker gave to the GAL:

A. I did communicate that the findings that I was presented with or made aware of would not have risen to the level of reasonable suspicion for

me to make a report myself.

* * *

A.   [Reasonable suspicion] * * * really is an individual threshold because we're all held responsible as individually as [sic] mandated reporters, so it really comes down to any findings medically or history that I'm given which for me would have equated to reasonable suspicion, in which case I would have been obligated to make a report.

Q.   So based upon the history provided by Mother, by Father, the photographs you reviewed of Mother, the forensic interviews that you were made aware of, the disclosures of the child, all that put together, everything that you reviewed, you did not feel that there was even a reasonable suspicion of abuse that would justify a report?

A.  That's correct.   The – when we use the word disclosure, it presumes a disclosure of abuse, so I just want to clarify that I am aware that the child made statements, but in the context of the medical findings and the treatments that had been administered by both parents, I, I would not have interpreted that as a disclosure of sexual abuse specifically.

* * *

A.   The, the May disclosure involved her disclosure of contact to that area with Dad's fingers, and I was also aware of the fact that they had used multiple over-the-counter and prescribed medications over a period of months in that area to treat the symptoms that she was experiencing, so I would not have been – I would not have concluded that that was a

disclosure as opposed to a statement of events in the context of that history. Tr. 3 at p. 23-25.

{¶ 54} The Bellbrook Police Department also investigated the May 2019 disclosure, but it declined to pursue charges and closed its investigation. Tr. 4 at p. 178; Tr. 2 at 203; Tr. 3 at p. 217. The GAL, Sean Vallone, talked to Detective Vetter of that department and was told that the police did not take the case to a grand jury because they did not feel they had even enough probable cause to take it to the grand jury. Tr. 3 at p. 217. After the police sent a letter closing their investigation, Father emailed Duncan (E.G.'s therapist) multiple times to ask if he could be involved in E.G.'s therapy because the investigation was closed, but he got no response. Tr. 4 at p. 233.

{¶ 55} After May 2, the first time Father saw E.G. was on May 23, 2019, at a swim meet. According to Father, E.G. ran up to him, grabbed his hand, and said that she was hoping to see him. She also asked where he had been and wanted him to go play toys with her. Tr. 4 at p. 141. Mother reported to the Children Services caseworker (Wojtowicz) that E.G. urinated herself when she saw Father. Tr. 1 at p. 309 and 325. During the custody hearings, Mother then stated that E.G. was changing in the changing area at the swim meet and Father was standing outside. Tr. 3 at p. 105. E.G. asked if Father was coming in, and then urinated on the floor. *Id.*

{¶ 56} Mother did not testify about this during the hearings, but Father's testimony was quite different. As indicated, he said E.G. was quite happy to see him. At some point afterward (neither parent said whether the urinating incident occurred before or after swim practice), Mother and E.G. were in a changing room and Father was nowhere near them; instead, he was out by the bulletin boards and saw Mother leaving the changing

area and walking to the bathroom. He asked Mother what happened, and Mother stated that E.G. had wet her pants. Tr. 4 at p. 142.

{¶ 57} E.G.'s next therapy appointment with Duncan was on June 3, 2019. During this session, Duncan did a "green flag/red flag explanation," meaning that a red flag touch is one where someone touches E.G. in private areas of her body where she wears underwear and she is to say "no" in a strong voice. Tr. 1 at p. 181. When Duncan asked E.G. if someone had ever given her a red flag touch, she said no. *Id.* at p. 231.

{¶ 58} Father's first visitation at the visitation center was on June 24, 2019. Tr. 4 at p. 149. On June 26, 2019, E.G. had another therapy appointment. Duncan asked her how her visit went with Father, and she said "good." E.G. did not make any disclosures at this appointment. Tr. 1 at p. 232-233. On July 10, 2019, E.G. and Duncan played a game where E.G. could draw a red card and say no in a strong voice or talk about what she was angry about or a red flag touch. Duncan asked E.G. if anyone had ever given her a red flag touch and she said "no." *Id.* at p. 186-188 and 233.

{¶ 59} On July 16, 2019, the magistrate held a review hearing on the interim order. During the hearing, Eve Wojtowicz testified that she was working on substantiating abuse and said that if the court ordered unsupervised visitation, she would go to juvenile court and file for protective supervision. July 16, 2019 Hearing Transcript, p. 10 and 11.

{¶ 60} During the final custody hearing, Wojtowicz described the facts known to her in July 2019 that, to her, substantiated abuse. Tr. 1 at p. 308-309. Specifically, Wojtowicz stated:

> [E.G.'s] disclosure was concise, and it was clear. The fact the child
>
> used the terminology that she [sic] stood on her knees was very compelling

to me. That she discussed how it hurt, and how her Dad would rub his fingers and his nails, and that it would hurt her.

The conversations I'd had with Mom about the little girl urinating herself when she saw her Father.

And video footage I saw of [E.G.] genuinely scared to go see her Father. She was screaming and crying.[10]

Tr. 1 at p. 309.

**{¶ 61}** During the interim custody hearing on July 16, 2019, Clements discussed the forensic interview she conducted with E.G. The GAL, Mesaros, was present at the hearing and also testified. Mesaros stated that he was not prepared to make a final report, as he was asked when he was appointed to "try to get enough information to be of some assistance" at the July 2019 hearing. July 16, 2019 Hearing Tr. at p. 76.

**{¶ 62}** Mesaros further indicated that he had seen the medical records and therapy records and their reports. He had also reviewed the Visitation Center information, had physically viewed visitation between Father and E.G., and had spoken with both parents, who had provided him with a lot of information. *Id.* at p. 77. Mesaros had also reached out to the Bellbrook detective, who had not returned his call. *Id.* At the hearing, Mesaros outlined his background as a prosecutor for 18-19 years and as an advocate for protecting children from abuse. *Id.* at p. 78-79. He also said, given his background, his

---

[10] Father was the one allegedly rubbing E.G. Tr. 1 at p. 309. The video in question was of the April 20, 2020 visit (Ex. YYY), that the trial court viewed. Mother did not show Wojtowicz the entire video. Tr. 1 at p. 324; Tr. 2 at p. 268-269; Tr. 3 at p. 87-88. Instead, the video was split into three parts. Id. at 268-269. Mother also never told Wojtowicz that E.G. had complained about Mother's nails hurting her, that she had showed Father how to apply cream, or that the cream was applied at bedtime on E.G.'s bed. Tr. 1 at p. 312; Tr. 3 at p. 113-114.

threshold was pretty low for getting an investigation started and considering prosecution. *Id.* However, he was not convinced the case had anything to do with sexual abuse, and based on his observations of the interaction between Father and E.G., visitation at the visitation center was unnecessary. *Id.* at p. 79-82. Mesaros, therefore, recommended phased in visitation on Wednesdays for a couple of hours, with someone supervising, and perhaps a Saturday for three or four hours, again with supervision and initially in public places. If those visits proceeded for some time without incident, Mesaros recommended that the Saturday visit could be extended to all day and overnight to Sunday. *Id.* at p. 82-84.

{¶ 63} After the July 16, 2019 hearing, Wojtowicz's supervisors told her that she was not allowed to find that abuse was substantiated and declined to take the case any further. Tr. 1 at p. 290 and 297-298. Wojtowicz left the agency and took a job with Daybreak on July 22 or 23, 2019, but stated this case had nothing to do with ending her employment at Children Services. *Id.* at 296-297. The Bellbrook police also declined to prosecute Father. Tr. 3 at p. 220.

{¶ 64} Between June 24 and August 19, 2019, Father visited E.G. at the visitation center. Tr. 4 at p. 149. In an August 1, 2019 therapy session, E.G. stated that she was sad because she did not want to go to her Dad's house. When asked why she did not want to go, E.G. said she was scared there. Tr. 1 at p. 190.

{¶ 65} On August 14, 2019, E.G. again saw the therapist, Duncan. Tr. 1 at p. 191. At trial, Duncan testified about this session as follows:

> She presented as more comfortable in this session. In most previous sessions, she presented as guarded and reluctant to participate.

During playing and feeling games, she stated, I'm going to tell you something.

This therapist asked, what she wants to tell me?

She stated, my Dad hurt my pee pee and rubbed it with his fingers and his nails. She stated, my Mother told me to tell you. She said it's good to tell the truth.

I ask her, is this the truth?

And she said, yes.

This therapist asked her, where she was when this happened?

She stated, she was in her bed.

Tr. 1 at p. 192. After August 14, 2019, E.G. did not make any further disclosures to Duncan.

{¶ 66} On August 22, 2019, the magistrate issued an order agreeing with the GAL that interim parenting time should be increased, but with "an abundance of caution." Magistrate's Order, p. 2. The magistrate therefore ordered that Father would have parenting time outside the visitation center on Wednesdays from 5:00 p.m. to 7:00 p.m. and on Sundays from noon until 4:00 p.m. Parenting was to occur in public places such as a mall or restaurant, and Father was to have another adult known to E.G. present at all times. *Id.* In addition, Father was not to accompany E.G. to the bathroom alone, nor was he to apply any ointments to E.G. *Id.* The order also stated that motions to set aside the order could be filed but that the order would not be stayed unless the court or magistrate entered a stay. *Id.* at p. 3. A final hearing was set for December 5, 2019.

{¶ 67} On August 22, 2019, Mother filed a motion to set aside the magistrate's

order.

{¶ 68} Father's first visit with E.G. after the magistrate's decision was on Sunday, August 25, 2019, from noon to 4:00 p.m. Both of Father's parents were there, and Father stated that the visit went great. Tr. 4 at p. 150. The next visit was on Wednesday, August 28, 2019, from 5:00 p.m. to 7:00 p.m. From the time the visit started until Father dropped E.G. at Mother's, the paternal grandfather, W.G., supervised the visit. Tr. 4 at p. 151. Father recorded the entire visit. *Id.* W.G. also testified that he was with Father and E.G. for the entire visit and there was never an opportunity for Father to be alone with E.G. *Id.* at p. 33.

{¶ 69} According to Mother, when E.G. returned home from the August 28 visit, E.G. had redness and stated that Father had touched her pee pee. E.G. made that statement on the way to the bathroom, and Mother observed redness when E.G. sat on the toilet. Tr. 2 at p. 105-106.

{¶ 70} Mother immediately took E.G. to DCH, alleging abuse. Tr. 2 at p. 107 and Tr. 3 at p. 14. During the hospital visit, E.G. was again examined and tests were run. Tr. 2 at p. 105-106; Tr. 4 at p. 167. Detective Strayer of the Sugarcreek Township Police Department also came to DCH and talked with Mother. In addition, Mother spoke with a social worker, and another referral was made to Children Services. Tr. 2 at p. 106; Tr. 4 at p. 155. E.G. was at the hospital for five hours, into the early hours of the morning. Tr. 4 at p. 229 and 184-185; Tr. 3 at p. 229. Mother did not tell Father that E.G. was taken to the hospital until the following day, nor did she tell Father about the abuse allegations. Tr. 4 at 175; Tr. 3 at p. 229.

{¶ 71} The next day, Allivia Clement conducted another forensic interview with

E.G. Tr. 1 at p. 38. During that interview, E.G. made the following disclosure:

A. She disclosed that the previous day she had been with her Father. They were going back to her Mom's house; and as he was carrying up to her mother's house, he had reached in between – the way that she described it – in between her legs, underneath of her vaginal area to carry her to the home.

She stated that his, his hand touched her vagina on the outside of her clothes, and she was wearing a skirt with shorts underneath of it.

Q. Now, you used your hands to demonstrate. Did the child do anything?

A. She did. She used her arm to describe herself, and she reached in between her legs underneath of her vagina during the interview.

Q. She actually stood up to do that?

A. Yes.

Tr. 1 at p. 39.

{¶ 72} E.G. never made a disclosure about the August 28, 2019 incident to her therapist. Tr. 1 at p. 254.

{¶ 73} As noted, W.G. was present during the entire August 28 visit. W.G. testified that, when they arrived at Mother's house, Father pulled the car into the usual spot in the driveway. W.G. got out of the car and walked around the back of the car to say goodbye to E.G. From where he stood, he was able to see Father and E.G. walk to the front door, but he did not walk all the way to the door. He estimated that the walk took 10 seconds. Tr. 4 at p. 28-29.

{¶ 74} Father videoed the entire August 28, 2019 visit. He sent this two-hour video to Mesaros, who was then still the GAL, and Father's attorney sent the video to law enforcement. Tr. 4 at p. 222. Mother also had video from driveway surveillance and a doorbell camera. *Id.* at p. 213. Mother's claim was that Father had abused E.G. on the walkway from Mother's driveway to the front door. *Id.* at 157.

{¶ 75} According to the evidence on the videos, the trip from the driveway to the front door took 30 seconds. Tr. 4 at p. 166. During that time, while carrying E.G., Father had his cell phone in his right hand with the phone pointing towards his shoulder and had E.G.'s shoes in his left hand. He did not have a hand available to reach around E.G. as she had described to touch her genitals, nor did he set E.G. down at any time and take things out of his hand. *Id.* at p. 216-217.

{¶ 76} According to the GAL, Vallone, Detective Strayer said the August 28, 2019 disclosure did not even rise to the level of abuse and was less strong than the May disclosure, which had already been declined. The police again declined to pursue charges against Father. Tr. 3 at p. 220. Vallone had also watched the videos and the forensic interview and had heard Clement's testimony at the custody hearing. *Id.* at p. 209. The GAL stated that "during that time, it seems highly unlikely that abuse could have occurred." *Id.* at p. 213.

{¶ 77} On September 10, 2019, Father filed an emergency motion to terminate the shared parenting plan and to reallocate parental rights. He also asked the court to establish child support and parenting time and, alternatively, asked the court to modify the parenting plan. *See* Father's Motion to Terminate Shared Parenting. In the motion, Father alleged that Mother was coaching the child and was attempting to alienate her

from Father.  *Id.* at p. 3-6.   Father also testified that he filed the motion because he was concerned about E.G.'s being probed and photographed at the hospital and how that impacted E.G. mentally, physically and psychologically.   Tr. 4 at p. 167.

{¶ 78} Mother responded to the motion, and on September 11, 2019, she filed a motion to remove Mesaros as GAL and appoint a new GAL.   In the motion, Mother argued, among other things, that the GAL had totally failed to properly investigate the case and seemed more concerned with Father's best interest than that of the child.   *Id.* at p. 6-7.

{¶ 79} On September 18, 2019, the court overruled Mother's motion to set aside the magistrate's decision.   On the same day, Mother filed a motion asking the court to hold Father in contempt for picking the child up and returning her on September 8, 2019, without having another adult in the car.   Mother also asked that Father's visitation with E.G. be returned to being supervised at the visitation center.   Motion to Show Cause, p. 1-2.   A hearing on this motion was scheduled for December 12, 2019.

{¶ 80} On September 30, 2019, Mesaros filed a request asking the court to award Civ.R. 11 sanctions against Mother's attorney for the comments he made in the motion to remove Mesaros as GAL.   In response, Mother's attorney filed a motion for Civ.R. 11 sanctions against Mesaros.   The court then set a hearing for October 18, 2019, on the motion to remove Mesaros.   At the hearing, the court heard testimony from Mesaros, who was questioned by both parties and also made a statement.   In addition, Mother presented testimony from an attorney who discussed what he would have done as guardian ad litem.   Transcript of Proceedings on October 18, 2019.

{¶ 81} On October 25, 2019, the court filed an order concluding that Mesaros did

not violate any of his responsibilities or duties as a GAL under Sup.R. 48 and that Mother's motion was baseless.   Decision and Order, p. 1.   However, the court also held that a new GAL should be appointed because it was clear that Mother would not have full confidence in the court's decisions if Mesaros remained as GAL.   *Id.* at p. 2.   The court therefore removed Mesaros as GAL and appointed Sean Vallone as the new GAL.   The court also set a January 27, 2020 hearing on the motion for Civ.R.11 sanctions and rescheduled the final custody hearing to begin on January 23, 2020.

{¶ 82} On January 21, 2020, Father filed a motion to continue the final hearing due to newly-discovered evidence (about alleged coaching of E.G. by Mother) and because Vallone had not submitted a GAL report seven days before the hearing as required by Sup.R. 48.   Subsequently, on January 23, 2020, Father filed a motion to replace the GAL and to strike his report.   Father also again asked to continue the final hearing.   Doc. #128.   In the motion, Father made the same complaints that Mother did about the prior GAL's failure to talk to witnesses, including parties who treated the child and investigators.

{¶ 83} At the January 23, 2020 hearing, the trial court heard from the parties concerning the motion to remove the GAL, and it overruled the motion.   Tr. 1 at p. 21. The court then heard the evidence.   During the first day, the court heard testimony from Mother's witnesses: Allivia Clement, Dr. Carpenter, Frances Duncan, and Eve Wojtowicz. On January 28, 2020, the parties agreed to the GAL's recommendations for Father's increased parenting time.   Tr. 1 at p. 348-357.   The court then put on an entry providing Father with additional parenting time on Tuesdays and Thursdays and every other Saturday from 9:00 a.m. to 7:30 p.m.   The court also stated that the parties could take video of E.G. but that "it must be done surreptitiously so that the child is not aware of the

camera."

{¶ 84} January 25, 2020, was the first parenting time for Father after the January 23, 2020 hearing. On that day, Father was never alone with E.G. Either Father's Mother was there or hundreds of people were there (at a father/daughter dance). Father even had his mother drive E.G. to the dance so he would not be alone in the car in the dark with E.G. Tr. 2 at p. 168-170. Mother then picked up E.G. from the dance, and she texted Father a few hours later, alleging that E.G. was red. *Id.* at p. 170. Father and Mother talked for a combined period of about an hour, discussing the situation. *Id.* at p. 170-171. No reports to the police or medical appointments resulted from this incident.

{¶ 85} On February 3, 2020, Mesaros moved to dismiss his motion for sanctions against Mother's attorney, and the motion was granted the same day. Mother then filed another show cause order for contempt on May 1, 2020, alleging that Father had violated the court's January 28, 2020 order by failing to videotape E.G. surreptitiously and by failing to reimburse Mother for his part of E.G.'s counseling bills from May 24, 2019 through January 2020. The court then set the contempt motion for hearing on May 12, 2020.

{¶ 86} On May 11, 2020, the court heard further testimony from Mother. Then, on May 12, 2020, the following individuals testified: Mother, Sean Vallone, and two of Father's witnesses – the Director of Early Education at the child's preschool, and Dr. Liker. Finally, on May 28, 2020, the court heard testimony from a friend of Father, W.G. (the paternal grandfather), and Father.

{¶ 87} On July 2, 2020, Father filed a motion for contempt based on Mother's

interference with parenting time, but the parties reached an agreement and the motion was dismissed. The court then filed an entry on August 21, 2020, indicating it needed further evidence on the medical expenses. As a result, the court scheduled another hearing for September 28, 2020.

{¶ 88} On September 2, 2020, Father filed another contempt motion against Mother for interfering with parenting time, for refusing to allow him telephone contact with E.G., and for refusing and interfering with Father's ability to participate in medical decision-making and treatment appointments. This contempt motion was also scheduled for hearing on September 28, 2020. On that date, the court heard evidence on the pending contempt issues and the medical bills.

{¶ 89} Finally, on October 13, 2020, the trial court filed three judgment entries. In the first one (First Judgment Regarding Contempt Motions, Doc. #180), the court denied Mother's motion for contempt as to Father's failure to have an adult present in the car on September 8, 2019, and found Father's motion to compel discovery moot. In the second judgment entry (Second Judgment Regarding Contempt Motions, Doc. #181), the court denied Mother's contempt motion as to videoing the child and her motion concerning medical bills, but ordered Father to pay $25.97. As to Father's contempt motion for denial of parenting time, the court found that Mother's interpretation of the January 28, 2020 parenting order was incorrect. The court declined to hold Mother in contempt, however, because the parties had agreed that Father was entitled to make-up parenting time. The court also awarded Father the expenses incurred for a process server after certified mail to Mother failed.

{¶ 90} In the third judgment entry (Judgment Terminating Shared Parenting, Doc.

#182), the court terminated shared parenting, designated Mother as the legal custodian and residential parent, and granted the Court's Standard Order of Parenting Time to Father. The court also made other orders pertaining to E.G., including forbidding both parties from taking pictures of the child's genitals and forbidding examination of such unless the child complained. In that event, another appropriate adult, rather than the parents, would do any examination. Other orders were also made to aid the parents in communicating with each other and to prevent further disputes.

{¶ 91} On October 25, 2020, Father filed a timely notice of appeal of the two judgments regarding contempt motions and the judgment terminating shared parenting; on November 12, 2020, he filed an amended notice of appeal in which he additionally appealed from the trial court's October 2019 order granting Mother's request to appoint a new GAL. In our view, the trial court's judgment ordering that a new GAL be appointed was an interlocutory order, not a final order; therefore, that order merged into the judgment terminating shared parenting, and it was not separately appealable. *See In the Matter of C.J.*, 10th Dist. Franklin No. 18AP-862, 2019-Ohio-1863. Nevertheless, we will address all four assignments of error that Father raises on appeal. We will consider these alleged errors in order, beginning with the court's decision to remove Mesaros as GAL.


II.   Removal of GAL

{¶ 92} Father's First Assignment of Error states that:

The Trial Court Erred by Removing David Mesaros as the Guardian ad Litem.

{¶ 93} Under this assignment of error, Father contends that the trial court erred in removing the first GAL, David Mesaros. According to Father, Mesaros was very experienced in the child abuse field, and Mother's motion to remove him was improperly based on the fact that Mesaros failed to find support for her abuse claims. Father argues that the court's decision gave Mother exactly what she wanted – another chance to convince a new GAL that a basis existed for terminating shared parenting.

{¶ 94} In responding, Mother argues that Father waived this assignment of error because he failed to object to the court's decision as required by Civ.R. 53(D)(3)(b)(iv). Mother further states that while plain error is the appropriate standard, the trial court's decision was appropriate even under an abuse of discretion review. Specifically, Mother reasons that the court's decision was proper because Mesaros's filing of a Civ.R. 11 motion for sanctions created a potential conflict with his continued performance as GAL.

{¶ 95} As a preliminary matter, Mother is incorrect in contending that Father waived this argument by failing to object to the trial court's decision. Civ.R. 53(D)(3)(b)(iv) and the waiver concept apply only to decisions of magistrates. *E.g., Woodbury v. Woodbury*, 2d Dist. Greene No. 2017-CA-57, 2018-Ohio-2026, ¶ 50 (failure to object to magistrate's decision waives error other than plain error on appeal). Here, the trial judge himself held a hearing on the motion to remove the GAL and then issued a decision. *See* October 18, 2019 Hearing Transcript, and October 25, 2019 Order. Thus, Father did not need to object and did not waive any error for purposes of appeal.

{¶ 96} Generally, abuse of discretion is the standard used to review trial court decisions in domestic relations cases. *Edwards v. Edwards*, 2d Dist. Montgomery No. 10-DR-279, 2013-Ohio-117, ¶ 17, citing *Booth v. Booth*, 44 Ohio St.3d 142, 144, 541

N.E.2d 1028 (1989). In the specific context of removal of guardians, the abuse of discretion standard applies. *E.g., In re S.M.K.*, 2d Dist. Miami No. 2008 CA 17, 2008-Ohio-6733, ¶ 44, citing *In re M.E.H.*, 4th Dist. Washington No. 08CA4, 2008-Ohio-3563, ¶ 25. "Abuse of discretion is a term used to indicate that a trial court's decision is unreasonable, arbitrary or unconscionable." *Montei v. Montei*, 2d Dist. Clark No. 2013-CA-24, 2013-Ohio-5343, ¶ 28, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶ 97}** After reviewing the record, we find no abuse of discretion on the trial court's part. Based on our review, we first do agree with the court that Mother's motion to remove the GAL was "baseless." October 25, 2019 Order at p. 1. Rather than having merit, the motion appears to have been premised on Mother's disagreement with the GAL's recommendations at the July 16, 2019 interim custody hearing. At that time, the GAL stated that he was "not convinced" the child's rash "had anything to do with sexual abuse," and he described the child and father's "wonderful" interaction at the visitation center. July 16, 2019 Hearing Transcript at p. 79. However, the GAL did recommend that resumption of non-visitation center parenting time should take place on a gradual basis, in public (to make Father and E.G. more comfortable), and with another person around to protect against more allegations. *Id.* at p. 83.

**{¶ 98}** As noted, after the magistrate granted Father parenting time in late August 2019, Mother filed a motion to set the decision aside and then filed a motion to remove Mesaros as GAL in early September 2019. In response to the motion to remove, Mesaros filed a request for Civ.R. 11 sanctions against Mother's attorney, who reciprocated by filing a motion asking the court to issue Civ.R. 11 sanctions against

Mesaros.   The court then held a hearing on October 18, 2019, concerning the motion to remove the GAL.

**{¶ 99}** Although Mesaros testified at the hearing that he felt he could continue as GAL and that he harbored no ill will against Mother, he also said that he felt he was being attacked and that the reason for doing so was "based more on posturing and trying to influence the proceedings than it has anything to do with the merits."   October 18, 2019 Hearing Tr., p. 47.   In view of the contentious circumstances, the trial court made the difficult decision to remove the GAL.   We find no abuse of discretion, while disapproving of what does appear to have been Mother's gamesmanship.   It is important to note the court's emphasis that Mesaros "**did not** violate any of his duties or responsibilities," and that the court had "no concern whatsoever in the integrity and honesty of the GAL." (Emphasis sic.)   Oct. 25, 2019 Order at p. 1-2.   With the reciprocal sanction requests between the GAL and Mother's attorney having been filed, the court's decision was not an abuse of discretion.

**{¶ 100}** We note that the day the final custody hearing began, Father also filed a motion to remove Sean Vallone as GAL, which the trial court denied.   In responding to the motion, Vallone stated that "[t]he final motion to remove basically impugning my competency by implying that I didn't do my job, frankly is a little offending and insulting just as I think Mr. Somers was to Mr. Mesaros."   Tr. 1 at p. 22.   The trial court agreed with this statement but said it did not believe delaying trial any further was in E.G.'s interests.   *Id.* at p. 23.   Again, the trial court did not abuse its discretion.   At that point, the proceedings had been pending with disruptions to parenting and to E.G. for a substantial period of time.   In addition, Vallone, while likely being irritated, had already

provided the parties and court with a written GAL report, whereas Mesaros's recommendations were only preliminary.

{¶ 101} Accordingly, the First Assignment of Error is overruled.

### III. Termination of Shared Parenting

{¶ 102} Father's Second Assignment of Error is as follows:

The Trial Court Erred by Terminating the Shard Parenting Plan and Limiting Father's Parenting Time.

{¶ 103} Under this assignment of error, Father makes several points in arguing that the trial court erred in terminating shared parenting. He contends no evidence was introduced at the hearing to support the court's conclusion that the parties' ability to cooperate and make joint decisions had been compromised. Father further argues that Vallone's recommendations were tainted by his statement that, while the evidence weighed against abuse, Vallone could not "conclusively determine that it had not" occurred. Appellant's Brief at p. 26, citing the GAL's Supplemental Report at p. 205. According to Father, he has been put in the impossible position of proving a negative fact.

{¶ 104} Father also contends that the trial court overlooked the fact that GAL amended his recommendation when he testified by saying that he "agreed with shared parenting continuing with one party being the ultimate decision maker after a decision making process." *Id.* at p. 27, citing Tr. 3 at p. 236-237.

{¶ 105} As indicated, we apply an abuse of discretion standard in reviewing decisions in domestic relations cases. *Edwards*, 2d Dist. Montgomery No. 25309, 2013-Ohio-117, at ¶ 17. Furthermore, trial courts have broad discretion in allocating parental

rights and responsibilities. *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). "In reviewing trial court decisions, appellate courts must also give deference to a trial court's findings, because ' "the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." ' " *Schutz v. Schutz*, 2017-Ohio-695, 85 N.E.3d 481, ¶ 21 (2d Dist.), quoting *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997). (Other citation omitted.)

{¶ 106} In *Davis,* the Supreme Court of Ohio stressed that "we are mindful that custody issues are some of the most difficult and agonizing decisions a trial judge must make. Therefore, a trial judge must have wide latitude in considering all the evidence before him or her * * * and such a decision must not be reversed absent an abuse of discretion." *Davis* at 418, citing *Miller* at 71. This observation is certainly true here, as the trial court stressed that its "decision to terminate shared parenting and designate Mother the residential parent is difficult," and that the court had "painstakingly reviewed the testimony of the experts and the parties in an attempt to definitively determine whether Father abused the child." Judgment Terminating Shared Parenting at p. 4.

{¶ 107} The shared parenting plan involved in the case before us was adopted pursuant to R.C. 3109.04(A)(1)(i), which covers plans where "both parents jointly make the request in their pleadings or jointly file the motion and also jointly file the plan." In that situation, R.C. 3109.04(E)(2)(c) provides that "[t]he court may terminate a prior final shared parenting decree that includes a shared parenting plan * * * upon the request of one or both of the parents or whenever it determines that shared parenting is not in the best interest of the children." Here, both parents asked for termination of shared

parenting, and the court also decided that termination should occur.

{¶ 108} In a recent decision, the Supreme Court of Ohio distinguished between modifying shared parenting plans and terminating a plan, based on the application of various parts of R.C. 3109.04(E) to those requests. *Bruns v. Green*, Ohio Slip Opinions No. 2020-Ohio-4787, ___ N.E.3d ___, ¶ 8-13 (discussing R.C. 3109.04(E)(1)(a)(1) and R.C. 3109.04(E)(2)(a) and (b) (modification), and R.C. 3109.04(E)(2)(c) (termination)). The court clarified that "a trial court is not required to find a change in circumstances, in addition to considering the best interest of the child, before terminating a shared-parenting plan and decree and designating one parent as the residential parent and legal custodian." *Id.* at ¶ 21. Once the plan is terminated, "the court shall proceed and issue a modified decree for the allocation of parental rights and responsibilities for the care of the children under the standards applicable under divisions (A), (B), and (C) of [R.C. 3109.04] * * * as if no decree for shared parenting had been granted and as if no request for shared parenting ever had been made." R.C. 3109.04(E)(2)(d). *Accord Bruns* at ¶ 14.

{¶ 109} This is what the court did here. First, the court held that terminating the plan was in E.G.'s best interest. In making this decision, the court considered the factors in R.C. 3109.04(F)(1), the factors in R.C. 3119.23, and the factors in R.C. 3109.04(F)(2). Judgment Terminating Shared Parenting at p. 3-4. The court then applied the factors in R.C. 3109.04(F) to decide how to allocate the parental rights and responsibilities. *Id.* at p. 5-7.

{¶ 110} Rather than placing the burden on Father to conclusively prove a lack of abuse, the court simply noted that it had tried to figure out if abuse had occurred, but was

unable determine that it had happened.

{¶ 111} In deciding if termination was in E.G.'s best interest, the court relied on R.C. 3109.04(F)(2)(a), (b), and (e).   These factors are: "(a) The ability of the parents to cooperate and make decisions jointly, with respect to the children; * * * (b) The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent; * * * [and] (e) The recommendation of the guardian ad litem of the child, if the child has a guardian ad litem."

{¶ 112} In discussing these factors, the court noted that "the parents' ability to cooperate and make decisions jointly has been severely compromised by this litigation." Judgment Terminating Shared Parenting at p. 3.   Having reviewed the record we cannot say that the court abused its discretion.   While the parties successfully co-parented for a time, the trial court's conclusion that the parents had lost the ability to cooperate for the sake of the child's best interest was reasonable.   In this vein, the trial court noted that Father's frustration and anger over the situation had been transferred to anger at Mother. *Id.*   This was supported by the GAL's testimony.   *See* Tr. 3 at p. 267-268.

{¶ 113} Furthermore, while the court focused more on Father's anger and frustration, the record also indicated that Mother was "very combative with counsel" during her testimony at trial.   Tr. 3 at p. 110 (trial court's admonishment of Mother).   In addition, the contempt motions filed during the proceedings indicated that Mother was inflexible on minor parenting time matters, and Father was less than accommodating in paying medical bills, such that the trial court eventually ordered the parties to use "Our Family Wizard" to communicate and to use "the Information Bank, MyFiles, and Expense Log tools on the website to have a future record of all potentially reimbursable expenses in order to

mitigate the necessity to litigate in the future over such matters." Judgment Terminating Shared Parenting at p. 9-11. The trial court reasonably concluded that this does not represent a scenario of parents who are able to successfully cooperate in co-parenting their child.

**{¶ 114}** The trial court did acknowledge that "[t]o terminate shared parenting without a conclusion that Father abused the child seems to punish Father for acts the Court cannot say he committed." *Id*. We agree. However, the court went on to emphasize that it "must place the child's best interest above all else. There is no doubt the minor child in this case has endured significant stress over the past two years." *Id*.

**{¶ 115}** Having reviewed the record, we recognize the difficulty that this case presented. It was a very close decision, and we may have held otherwise with respect to designating the residential parent. However, we cannot substitute our decision for that of the trial court and must defer to the court's findings, as the court spent many hours hearing testimony and had a better opportunity to observe the witnesses.

**{¶ 116}** Furthermore, some of Mother's actions appear to have been designed to control and restrict Father's parenting. As previously noted, she was deceptively selective and manipulative in the information she provided to investigators. The first GAL did state, when discussing Dr. Liker's examination of E.G. on May 29, 2018, that "[t]here were findings that the doctor made that mom describes far more seriously and dramatically than what the doctor described." July 16, 2019 Tr. at p. 103. However, the court weighed this information in exercising its discretion.

**{¶ 117}** Accordingly, the trial court did not abuse its discretion in terminating the shared parenting plan. Once that occurred, the court was faced with deciding which

parent should be designated legal custodian and residential parent and how to otherwise allocate the parental responsibilities. As indicated, the court applied the factors in R.C. 3109.04(F)(1). Judgment Terminating Shared Parenting at p. 5-7. After doing so, the court said that:

> The decision to name Mother residential parent and legal custodian required significant thought and an excessive review of the record. As stated, most of the best interest factors did not weigh in favor of either party. The Court's decision to name Mother residential parent boiled down to two facts. First, Mother has been the child's primary caregiver for the last fourteen months. There has been significant disruption to the minor child's life and routines. In order to begin stabilizing the minor child's life, the Court finds it is in the child's best interest to continue making her primary residence with Mother.
>
> Second, the GAL recommended that Mother be named the residential parent after an extensive investigation, and the creation of a GAL Report and Supplemental GAL Report. These facts also weighed heavily in the Court's determination of Father's parenting time schedule.
>
> Ultimately, the Court has determined it is in the child's best interest to adopt the GAL's recommendations for parenting time with some modifications.

*Id.* at p. 7-8. The court then gave Father the Standard Order of Parenting Time, but allowed Father to begin that time immediately, rather than following the GAL's recommendation of continuing monitoring for a period of time, then going to the Standard

Order.  Tr. 3 at p. 214.

{¶ 118} Father is correct that it does seem unfair to weigh Mother's time as primary care giver for the prior fourteen months in her favor considering her manipulative behavior. However, again, we review the court's decision for abuse of discretion as to what is in the best interests of the child.  As an initial matter, as the trier of fact, the court decides what credibility and weight to give to a GAL's report.  *In re E.M.W.*, 2d Dist. Champaign No. 08-CA-25, 2009-Ohio-3016, ¶ 18.  A trial court is not required to follow a GAL's recommendations, but may do so if the court agrees.  *E.g., Bomberger-Cronin v. Cronin*, 2d Dist. Greene No. 2014-CA-4, 2014-Ohio-2302, ¶ 42.  Here, while the court agreed with the GAL and gave weight to his opinions, the court also deviated where it thought appropriate.

{¶ 119}  This was a very difficult case.  Both the trial court and GAL agreed that "the child's been put through some extreme trauma."  Tr. 3 at p. 252.  This is a reason for the restrictions in the judgment entry, which prohibit *both* parties from photographing or examining E.G.'s genitals unless she complains, and even then, any examination must be done by another appropriate adult.  In addition, Mother was prohibited from interrogating or questioning E.G. after Father's parenting time, and *both* parties were prohibited from discussing the situation with E.G.  Judgment Terminating Shared Parenting at p. 8-9.  In the end, E.G.'s welfare was the main concern, and the trial court did not abuse its discretion in selecting the method it found best to stabilize her life.

{¶ 120} During discussion with the court at the May 12, 2019 hearing, the GAL did say that he would not object if shared parenting stayed in place, but in that event, Mother should be the final decision-maker on matters like extracurricular activities and school

residence.   Tr. 3 at p. 236-237.   However, the GAL stressed that both parents had asked to terminate shared parenting, and his role was to recommend who should be the sole custodian and residential parent in that situation.   *Id.* at p. 237-238.   The GAL further said he would adamantly oppose shared parenting if it involved joint decision-making. *Id.* at p. 238.   As we have already discussed, the trial court did not abuse its discretion in concluding that these parties do not have the ability at present to cooperate with each other.

{¶ 121} Father spends a substantial amount of time in his brief discussing the trial court's failure to consider Mother's interference with parenting time; Father's theory that Mother turned a "minor genital irritation into an abuse allegation as a preemptive defense to [Father's] intention to formally amend the parties' shared parenting agreement to reflect equal parenting time"; Mother's doctoring of a parenting time exchange to support her emergency motion and "to deceptively reflect the child's reluctance to spend time with her Father"; Mother's coaching of E.G. "to make disclosures in proximity to hearings when she perceived the case was not going in her favor"; and the fact that Mother subjected E.G. "to several physical examinations, multiple forensic interviews, * * * and convinced this little girl that her dad sexually abused her."   Appellant's Brief at p. 28-30.

{¶ 122} We are troubled by some of Mother's behavior, most particularly the events surrounding the August 28, 2019 accusations of abuse, which are literally impossible to have occurred in the manner suggested.   We also note the trial court's concern over giving Mother "the power to say now, this, this allegation was made and now there's another six-month's process," and the child's comment that "Mom told me to say this.   Mom told me to tell you."   Tr. 3 at p. 254 and 256.   In this context, the court

observed that "I can tell you and everyone in this room where that heads if Mom continues to do that, she's heading down to the – down the road of losing custody. * * * And if there's any sort of abuse going from Dad's side, and that's later proved, he's heading down the road of probably going to prison."   *Id.* at p. 255-256.

{¶ 123} Again, we may not have made the same decision, but we cannot substitute our judgment for that of the trial court, given that the court had the ability to see and hear the witnesses and to judge their credibility.   As we stressed, in the final analysis, the child's stability and welfare were the predominant concerns (as they should be for the parents), and the trial court made a very conscientious and thorough analysis in coming to its decision.

{¶ 124} We agree with Father that he should not have had to provide "conclusive proof" that he did not commit abuse.   However, the trial court did not require such proof. In fact, the court allowed Father unsupervised parenting time despite the fact that Mother and the GAL wanted supervision to continue.   The court was focused on E.G.'s best interest.

{¶ 125} As a final point, " '[w]e have previously emphasized, and stress once again, that children have certain rights, including " 'the right to love each parent, without feeling guilt, pressure, or rejection; the right not to choose sides; the right to have a positive and constructive on-going relationship with each parent; and most important * * * the right to not participate in the painful games parents play to hurt each other or to be put in the middle of their battles.' " ' "   *Owais v. Costandinidis*, 2d Dist. Greene No. 2014-CA-5, 2014-Ohio-4103, ¶ 66, quoting *Bell v. Bell*, 2d Dist. Clark No. 97-CA-105, 1998 WL 288945, *1 (June 5, 1998). (Other citation omitted.).   In *Owais*, a parent lost legal custody

based on her history of unfounded abuse allegations and failure to facilitate parenting time with the child's father.   *Id.* at ¶ 13, 15, 21, 49, 56, and 63.   We affirmed the court's decision.   *Id.* at ¶ 91.

{¶ **126**} Based on the preceding discussion, Father's Second Assignment of Error is overruled.


IV.   Contempt Motion

{¶ **127**} Father's Third Assignment of Error states that:

The Trial Court Erred by Failing to Hold Mother in Contempt for Her Repeated Interference with Father's Parenting Time.

{¶ **128**} Under this assignment of error, Father argues that the trial court erred by not finding Mother in contempt when she failed to follow the court's January 28, 2020 parenting time order.   In this regard, Father points to his July 2020 motion for contempt, which was resolved and dismissed by an agreement based on Mother's position that if Father failed to agree to her proposal, the parties could wait for resolution until after a scheduled hearing on August 11, 2020 took place.   Tr. 5 at p. 37-41.   According to Father, after he agreed, Mother then began interfering with parenting time again, resulting in the need to file another motion for contempt in September 2020.

{¶ **129**} "Contempt of court" is defined as " 'disobedience of an order of a court.   It is conduct which brings the administration of justice into disrespect, or which tends to embarrass, impede or obstruct a court in the performance of its functions.' "   *Denovchek v. Trumbull Cty. Bd. of Commrs.*, 36 Ohio St.3d 14, 15, 520 N.E.2d 1362 (1988), quoting *Windham Bank v. Tomaszczyk*, 27 Ohio St.2d 55, 271 N.E.2d 815 (1971), paragraph one

of the syllabus. " '[T]he purpose of contempt proceedings is to secure the dignity of the courts and the uninterrupted and unimpeded administration of justice.' Therefore, since the primary interest involved in a contempt proceeding is the authority and proper functioning of the court, great reliance should be placed upon the discretion of the trial judge." *Id.*, quoting *Windham Bank* at paragraph two of the syllabus.

{¶ 130} Although contempt proceedings are said to be neither civil nor criminal, courts often need to classify them as either civil or criminal. *Id.* at 16. "The distinction between civil and criminal contempt is based on the character and purpose of the contempt sanctions. If sanctions are primarily designed to benefit the complainant through remedial or coercive means, then the contempt proceeding is civil. Often, civil contempt is characterized by conditional sanctions, i.e., the contemnor is imprisoned until he obeys the court order. Criminal contempt, on the other hand, is usually characterized by an unconditional prison sentence or fine. Its sanctions are punitive in nature, designed to vindicate the authority of the court." (Citations omitted). *Id.*

{¶ 131} " 'A prima facie case of civil contempt is made when the moving party proves both the existence of a court order and the nonmoving party's noncompliance with the terms of that order.' " *Jenkins v. Jenkins*, 2012-Ohio-4182, 975 N.E.2d 1060, ¶ 12 (2d Dist.), quoting *Wolf v. Wolf*, 1st Dist. Hamilton No. C-090587, 2010-Ohio-2762, ¶ 4. " 'Clear and convincing evidence is the standard of proof in civil contempt proceedings.' " *Id.*, quoting *Flowers v. Flowers*, 10th Dist. Franklin No. 10AP 1176, 2011-Ohio-5972, ¶ 13. "We review the trial court's decision whether to find a party in contempt under an abuse-of-discretion standard." *Id.*, citing *Wolf* at ¶ 4.

{¶ 132} In this case, the trial court declined to find Mother in contempt because her

violation was not willful. Second Judgment Regarding Contempt at p. 4. The court's decision was based on the fact that, while Mother's interpretation of the January 28, 2020 order was incorrect, the parties did agree that Father was owed make-up parenting time. *Id.* In apparent recognition that Mother was more at fault, the court required her to pay for Father's cost in obtaining a process server. *Id.*

**{¶ 133}** The hearing transcript indicates that Mother had a particular interpretation of the court's order, but offered to make up the parenting time if her interpretation was incorrect. Tr. 5 at p. 71. Therefore, the trial court did not act unreasonably in refusing to find that Mother acted willfully.

**{¶ 134}** Nonetheless, our review of the record in its entirety indicates that Mother's conduct was controlling and somewhat inflexible. For example, the trial court overruled Mother's contempt motion about Father's failure to have an adult in the car with him, noting that the order did not specifically prohibit Father from driving to a public place without a supervisor, and that "*Mother had plenty of time to seek clarification of the order, but did not.*" (Emphasis added) First Judgment Regarding Contempt at p. 2. *See also* Tr. 2 at p. 69 (in December 2018, Mother told Father that E.G. would stay with her until the redness cleared up and that the subject was "not up for debate"); Tr. 3 at p. 269 (Mother told Father he was no longer allowed to have parenting time at her house). Whether these latter pronouncements were appropriate or well-intended is not the issue; they were made when the parties had shared parenting and were supposed to cooperate and make joint decisions. Thus, while we agree that Mother's actions may not have been willful, the court could consider future actions to be so if Mother continues to unilaterally interpret court orders in a manner that limits Father's parenting time.

{¶ 135} Based on the preceding discussion, the Third Assignment of Error is overruled.


V.   Expense Reimbursements

{¶ 136} Father's final assignment of error states that:

The Trial Court Erred in Its Calculation of Expense Reimbursements.

{¶ 137}  Father contends that the trial court erred in finding that he was required to pay Mother $25.97 toward a $75 medical bill that was owed.   Father argues that the court should have ordered zero reimbursement because the Shared Parenting Plan required that Mother pay the first $100 of unreimbursed medical expenses for the calendar year.

{¶ 138} In response, Mother focuses on other medical bills that Father allegedly failed to pay.   However, the trial court rejected those claims during the hearing because Mother failed to provide Father with copies of uncovered medical bills on a quarterly basis as required by the Shared Parenting Plan.   Tr. 5 at p. 24-25 and 29-33.   Instead, only one $75 payment was properly submitted to Father as required by the Plan.

{¶ 139} The Shared Parenting Plan designated Father as the Obligor for purposes of providing health insurance coverage.   Shared Parenting Plan at p. 4.   The Plan further provided, in pertinent part, that:

Obligee shall be responsible for the first $100.00 insured per child per calendar year of uninsured medical, dental, and optical expenses. Costs of the remaining medical, dental, optical, and all psychological expenses not covered by health insurance shall be shared by Obligor and

Obligee in amounts equal to their percentage of total income found on the Child Support Computation Worksheet * * *

The parties shall provide each other with a copy of all medical bills, amounts paid, and by whom for the minor child(ren) on a quarterly basis. The uncovered medical bills shall be provided on the last day of the months of March, June, September, and December. Payment for all uncovered medical expenses shall be made within thirty (30) days.

*Id.* As the Obligee, Mother was responsible for the first $100 of unreimbursed expenses for the calendar year.

{¶ 140} As noted, Mother did not comply with the requirement to provide timely notice of uncovered medical bills, with the exception of one $75 bill. At the hearing, the trial court stated that Father therefore did not owe Mother anything. Tr. 5 at p. 32-33. In contrast, however, the judgment entry required Father to pay $25.97 as his proportionate share, which was incorrect. Accordingly, the Fourth Assignment of Error is sustained. This matter will be remanded so the trial court can amend its October 13, 2020 judgment entry (the Second Judgment Regarding Contempt, Doc. #181), to indicate that Father does not owe Mother any money and that Mother is to remit to Father the $25.97 she was credited for unreimbursed medical expenses.

## VI.   Conclusion

{¶ 141} The trial court's Judgment Terminating Shared Parenting, which included, among other issues, its determination that the GAL should be replaced, is affirmed. The trial court's Second Judgment Regarding Contempt Motions is affirmed in part and

reversed in part, and the matter is remanded to the trial court for correction of the judgment entry regarding the treatment of medical expenses. Because Father's appeal raises no issues with respect to the trial court's First Judgment Regarding Contempt Motions, we take no action with respect to that judgment.

. . . . . . . . . . . . .

HALL, J. and EPLEY, J., concur.

Copies sent to:

Brian A. Sommers
Adam Armstrong
Matthew D. DiCicco
Sean J. Vallone, GAL
Hon. Cynthia Martin